483 So.2d 934 (1986)
Alton R. JOSEPH and Credell Buckner Dominquez, Individually as Administratrix of the Estate of Her Minor Children, Tonel Dominquez and Rahsaanica Joseph
v.
BOHN FORD, INC. and Ford Motor Company.
No. 85-C-1677.
Supreme Court of Louisiana.
February 24, 1986.
Concurring Opinion March 5, 1986.
Rehearing Denied March 20, 1986.
*935 Lawrence D. Wiedemann, W. Lloyd Bowers, Wiedemann & Fransen, New Orleans, for plaintiffs-applicants.
Dermot S. McGlinchey, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, Edward E. Rundell, Gold, Simon, Weems, Bruser, Sharp, Sues & Rundell, Alexandria, E. Ross Buckley, Jr., Robert H. Cooper, Blue, Williams & Buckley, Metairie, for respondents.
WATSON, Justice.
In this product liability-redhibition suit, plaintiffs received personal injuries resulting from the collision of a 1980 Ford van with an overpass support pillar. A jury determined that the van had a defect at the time Ford Motor Company sold it to Bohn Ford, Inc., and that Bohn Ford, Inc., was negligent.
*936 Plaintiff, Alton R. Joseph, was awarded damages of $1.7 million and attorney's fees of $187,000 in the redhibition suit. There were three other plaintiffs: Credell Buckner Dominquez received $50,000; Tonel Dominguez $13,000; and Rahsaanica Joseph $4,000. Bohn Ford, Inc., paid its share of the judgment, and Ford Motor Company appealed. The Court of Appeal reversed as to Ford, concluding that any defect in the brakes of the van was not traceable to the manufacturer. Joseph v. Bohn Ford, Inc., 472 So.2d 185 (La.App. 4 Cir.,1985). A writ was granted to review the judgment of the Court of Appeal. 477 So.2d 695 (La.,1985).

MOTION TO DISMISS
Defendant, Ford Motor Company, filed a third party claim against Kelsey-Hayes Company, manufacturer of the van's proportioning valve. After a hearing on January 17th, Kelsey-Hayes received a directed verdict from the trial judge on January 18, 1984. The jury verdict was rendered on January 19th and the judgment holding Bohn and Ford liable to plaintiffs was signed on January 24, 1984.
Kelsey-Hayes contends that there was no appeal from the judgment in its favor and it is entitled to be dismissed from the proceedings. Ford opposes the dismissal, contending that there was a timely appeal of the whole case including the directed verdict in favor of Kelsey-Hayes, and, alternatively, that the Kelsey-Hayes' judgment is not final for lack of notice of its signing.
Ford Motor Company appealed from the judgment of January 24, 1984, and was granted an appeal from that judgment, which noted that Kelsey-Hayes had been previously dismissed as a defendant on motion for directed verdict.[1] The January 18, 1984, judgment in favor of Kelsey-Hayes was a final judgment. LSA-C.C.P. art. 1841.[2]
Ford had filed a request for notice of all judgments entered in the case on March 3, 1982. However, granting that this request was sufficient,[3] notice of the signing of a final judgment is required only when the judgment is not signed at the conclusion of a trial. LSA-C.C.P. art. 1913.[4] The article is intended to cover situations where the judgment is not signed "until some time later."[5] The judgment granting the motion for a directed verdict in favor of Kelsey-Hayes *937 was signed the day after conclusion of the hearing with all counsel present in court. The January 24th judgment also gave notice of the prior judgment. Specific written notice was superfluous.
Ford Motor Company appealed only from the judgment of January 24th, which was not a final judgment affecting Kelsey-Hayes.
For the foregoing reasons, Kelsey-Hayes is not a party to the appeal and its motion to dismiss the appeal is granted.[6]

ISSUE
Did plaintiffs prove that there was a vice or defect in the van when it left the manufacturer which was a cause in fact of the accident and injuries?

FACTS
Plaintiff, Alton Raymond Joseph, purchased the 1980 model van on December 12, 1979, to transport small children. It was a demonstrator with 3,321 miles on the odometer, but a new van was unavailable. The purchase price was $19,348.96. The van had the Ford warranty of a new vehicle and Joseph purchased an extended warranty service contract extending to October 17, 1982, and 50,000 miles.
Six weeks after purchasing the van, Joseph took it to Bohn Ford because of a squeaking noise in the rear. When the tire hubs were taken off, both back brake shoes fell to the ground in a cloud of ashes. The back pads were much worse than those on the front but all four were changed. This repair was on February 1, 1980, at 7,176 miles. Approximately ten days later, there was the same humming/squeaking sound in the rear of the van. Joseph returned the van to Bohn on February 12, 1980; the rear brake pads were burned through.[7] When the brakes made a grinding sound a few days later, Joseph told Robert Bohn that he wanted his money back or another van. The Ford locator could not find another van and Joseph was told to leave the premises by a policeman.[8]
Two friends of Joseph's witnessed the altercation at Bohn. At first, Bohn refused to fix the van. Policemen stood around while Joseph was arguing, one of them with his hand on his gun. When the back wheels were taken off, everything again fell to the floor in a cloud of dirt: the brake shoes, the screws, and the dust. About 1:00 o'clock that afternoon, February 15, 1980, Joseph was told that the van had been repaired. The receipt showed 8,424 miles on the odometer. Bohn's repair order stated: "Rear brakes are defective."[9]
On March 4, 1980, Joseph heard the same sound and called Robert Bohn from the A & G Cafeteria at the intersection of Gentilly Boulevard and Elysian Fields. After Joseph and his family left the cafeteria, they drove to the red light controlling the intersection of Elysian Fields and Miro. When the light changed from green to yellow, two or three vehicles in front of Joseph stopped. When he applied his brakes, the van swerved; the brakes locked; and the van jumped the neutral ground to hit one of the support pillars of Interstate 10. Rahsaanica, the baby, was on Credell's lap and Tonel was sitting directly behind Credell. Joseph leaned toward the door when he saw the collision coming. Since the window was open, he was thrown partly out of the van before the collision. The windshield was broken over him and the other occupants. Joseph, his "common law" wife, Credell, and the two children were taken to Charity Hospital.
*938 Fred Liebkemann testified as an expert in the field of mechanical engineering that he inspected the van at the Joseph residence on April 1, 1980, and drove it slowly to Duckworth Tire Service on Metairie Road where he had the wheels removed so that he could examine the braking system. He had already detected a significant problem with the brakes enroute to Duckworth's. When Liebkemann examined the brakes, the front brake pads were normal, but the rear pads were worn off. The primary and secondary shoes in the rear were reversed. This reversal of the brake shoes would not have had any effect on the accident; at most, it would have hastened the wearing of the pads. The vehicle had 9,787 miles of use. Generally, brake linings should last no less than 25,000 miles. Having examined the Bohn Ford repair estimates which showed brake repairs at 7,176 miles and 8,424 miles, this expert concluded that there was a defective condition in the brake system. New brake pads were put on the rear wheels so that the van could be safely moved.
In Liebkemann's opinion, the defect in the rear brakes caused the accident by creating unequal braking on the two sides of the car which put the car into a spin prior to the wheels locking. Discoloration in the rivet heads of the van's brake shoes showed that they had been heated red hot causing erratic brake function and the sensation of the brakes being locked; the condition could cause almost any type of deviant result.
Liebkemann said one underlying cause prompted the first, second, and third sets of brake shoes to wear out and the wear on the last set caused the accident. Thus, the failure of the brakes on the date of the accident was caused by the same problem that existed when Bohn first repaired the brakes on February 1, 1980. The condition was not one that a person would necessarily notice while driving the car and was highly abnormal. One possible cause of the problem was a defect in the proportioning valve which caused the rear brakes to stay partially on at all times the car was being driven. Liebkemann had no knowledge of any design defect in the proportioning valve but it could have malfunctioned from contaminants in the system because of inadequate cleaning after manufacture.
Bulletins from Ford Motor Company to its dealers warned that the 1980 Fords had a new parking brake system. If the parking brake was adjusted in what had previously been the normal fashion, the rear brakes would stay partially on all the time resulting in abnormal wear of the rear brakes. After the wheels were put back on at Duckworth, there was no parking brake drag, indicating to Liebkemann that this was not the van's problem. Also, he testified that a driver who rode the brake with his left foot would cause equal wear on the front and the rear shoes, rather than this type of wear. Driver abuse did not cause the excessive wear on the rear brake shoes.
Eugene L. Rogers testified as an expert in design and composition of brake linings that passenger car brake linings had been put on the van's rear brake shoes, not truck pads. According to Rogers, Ford's passenger car rear brake segments should last 20,000 miles.
Billy McDougall, service manager at Bohn Ford, testified that he was a line mechanic at the time in question and observed a repair on the rear brakes of the van. The linings were completely destroyed, burned up, fell off the shoes in dust, and the metal drum was cut. The rear brake shoes were replaced. McDougall testified that warranty work is billed to Ford Motor Company. Only defective parts can be returned for credit. McDougall is certified as a Ford trained mechanic. The mechanics' training program is run by Ford Motor Company.
Harold Myers testified as an expert in mechanical engineering with special training in brake structure and development. His examination of the brake drum showed it had been scored very deeply indicating the car had been driven with worn out brake linings. This expert removed the *939 proportioning valve[10] from the van and used it on another vehicle without any malfunction. Riding the brake would not have resulted in this disproportionate wear, because it would engage both front and rear brakes. There was no evidence of parking brake drag on the rear brakes, eliminating that as a cause of the abnormal wear on the rear shoes. Myers confirmed that Bohn had put passenger car linings on the rear brake shoes of this van. A truck brake shoe has twelve rivets rather than the ten on a passenger car shoe. Although the passenger car pads would make some difference, Myers did not believe that the differential could account for the wear shown here. In Myers' opinion, malfunction of the hydraulic system could have caused premature wear on the rear brake shoes; he could not isolate any exact cause. Valves other than the proportioning valve could not be tested because they had been stripped from the vehicle.[11] Myers said the condition of the brakes on the Joseph van could have caused a "lockup".[12]
James Varin, an employee of Ford Motor Company, had design responsibility for the brakes on this van and testified as an expert in mechanical engineering, automotive engineering, brake, wheel and tire systems. In his opinion, brake linings should last between 15,000 to 20,000 miles in normal use, but would wear out much earlier if the vehicle were operated in a heavily loaded condition and made frequent stops. Truck brake linings are designed for greater loads and durability than passenger car linings. In Varin's opinion, the linings on the brake shoes of the Joseph van disintegrated because of the absence of the required number of rivets, the composition of the linings, which were formulated for passenger rather than truck use, and the primary and secondary shoes being reversed. Passenger car linings were put on the rear brakes on two occasions: on February 1st and February 15th. Varin admitted that Ford owed Joseph warranty service with a factory trained mechanic.
Ira Robert Ehrlich testified as an expert in mechanical and automobile engineering and accident reconstruction that the accident did not result from a problem with the brakes. In his opinion, the driver lost control in wet weather from driving too fast. Cross-examination cast some doubt on that opinion. Ehrlich admitted that there was a problem with the braking system, and this vehicle should have had brakes which would last between 30,000 and 50,000 miles. Various possibilities could have caused the gross problem with the brakes: maladjustment of the emergency brake; malfunction in the proportioning valve; corruption in the brake fluid line or improper driving. In his opinion, passenger car shoes on this light truck would make the brakes wear out more quickly, but not this quickly. Similarly, reversal of the primary and secondary shoes would cause uneven wear, but should not result in deterioration after such a short interval.
Robert Bohn testified that he knew Joseph's van would be used to transport children. Joseph intended purchasing another van and made three payments in January in furtherance of that aim. On each occasion when Joseph had trouble with the brakes he called Robert Bohn first and then brought in the van the next day. Joseph was never charged with any of the repairs and it was never alleged that he was misusing or abusing the van in any of Bohn Ford's documents. The automobile warranty is made by Ford to the customer and is carried out by the dealer under an agreement with Ford in which Ford reimburses the dealer for warranty work. Bohn admitted that Joseph might have called him on the afternoon or evening of the accident, although he did not specifically remember that fact. The van which was sold to Joseph had not been altered or changed in any way by Bohn Ford except *940 for replacing the windshield and a side glass. According to Bohn, Ford Motor Company encourages the use and sale of demonstrators.
Wilfred G. Gallardo, an expert in occupational safety and health, testified that Joseph should have parked his vehicle and should not have attempted to drive.
Freddie Rogers, fleet manager at Bohn Ford for eleven to twelve years prior to the accident, had driven the van as a demonstrator. There were no repairs on the van during his use; he did not know how the van acquired the cracked windshield and broken window. The van is called a "Captain's Club Wagon, a top of the line van ... between a half ton and a quarter ton."[13] It is a truck with a truck license and should have truck equipment.

LAW
LSA-C.C. art. 2545 states:
"The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages."
When a purchaser without fault sustains an injury caused by a defect in the design, composition or manufacture of a product, which makes it unreasonably dangerous in normal use, the manufacturer is liable, being presumed to know of the vices in the things he makes. Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971); Radalec, Incorporated v. Automatic Firing Corporation, 228 La. 116, 81 So.2d 830 (1955).
A plaintiff in a product liability suit must prove that the product was defective, i.e., unreasonably dangerous to normal use; that the product was in normal use at the time the injury occurred; that the defect caused the injury; and that the condition existed when the product left the control of the manufacturer or supplier. Bell v. Jet Wheel Blast, Division of Ervin Industries, 462 So.2d 166 (La., 1985). The manufacturer must reasonably have anticipated that the defect might cause injury. Hunt v. City Stores, Inc., 387 So.2d 585 (La., 1980).
A manufacturing defect may be established by circumstantial evidence. "If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing;..." Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599 at 603, 250 So.2d 754 at 756 (1971); Chappuis v. Sears Roebuck and Company, 358 So.2d 926 (La., 1978). See Mahan Volkswagen, Inc. v. Hall, 648 S.W.2d 324 (Tex. App., 1982);[14]Thiele v. Chick, 631 S.W.2d 526 (Tex.App., 1982). Identification of the specific defect is often impossible. Weber, supra. See Vandermark v. Ford Motor Company, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964) and Elmore v. American Motors Corporation, 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84 (1969). Plaintiff must only create a reasonable inference that the defective condition of the product was there at the time of the sale; it is not necessary to prove defective design or manufacture. Hunt v. City Stores, Inc., supra. Malfunction of brakes on a relatively new car creates a prima facie case of a defective product; lack of proof of any other reasonable cause indicates that the defect existed when the automobile left the manufacturer. See Tweedy v. Wright Ford Sales, Inc., 64 Ill.2d 570, 2 Ill.Dec. 282, 357 N.E.2d 449 (1976).
Plaintiff's burden of proving causation may be met by circumstantial evidence. Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971); Naquin v. *941 Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (1963); Weber, supra. Circumstantial evidence of causation need not negate all other possible causes. De-Battista v. Argonaut-Southwest Insurance Company, 403 So.2d 26 (La., 1981), cert.den. 459 U.S. 836, 103 S.Ct. 82, 74 L.Ed.2d 78 (1983).
Both the manufacturer and the retailing supplier of a defective product are liable. See Bell v. Jet Wheel Blast, supra; Chappuis v. Sears Roebuck & Company, supra.

CONCLUSION
Since the evidence fully supports the jury's factual findings that this Ford van was defective, with brakes which made it unreasonably dangerous in normal use and that plaintiffs' injuries were caused by the defective brakes,[15] the only liability question is whether the defective condition of the brakes existed when the van left the control of the manufacturer or supplier. Bell v. Jet Wheel Blast, supra.
The van was purchased from an authorized Ford dealer with a new car warranty and the brakes failed approximately six weeks and 3,800 miles after the purchase. There is no evidence of abnormal use. The failure of the brakes to function in the manner reasonably to be expected by the purchaser within such a short period of time creates a prima facie case that the product was defective and that the defect existed when the vehicle left the control of Ford Motor Company. See Tweedy v. Wright Ford Sales, Inc., 64 Ill.2d 570, 2 Ill.Dec. 282, 357 N.E.2d 449 (1976).[16] At the time of plaintiffs' accident, the brakes of the van were in precisely the same abnormal defective condition that existed six weeks after the sale.
The warranty repair work was required by the defective condition which must have existed when the automobile was sold to Joseph. See Hasson v. Ford Motor Company, 32 Cal.3d 388, 185 Cal. Rptr. 654, 650 P.2d 1171 (1982), cert. dismissed 459 U.S. 1190, 103 S.Ct. 1167, 75 L.Ed.2d 422 (1983). Since the repairs, guaranteed by Ford, were caused by the initial defective manufacture, Ford is liable despite the negligent repair work by Bohn. See Mahan Volkswagen, Inc. v. Hall, supra. Bohn's negligent failure to repair the defective condition, which inferentially existed at the time of the sale, cannot exonerate the manufacturer for producing the van with defective brakes. Hunt v. Ford Motor Company, 341 So.2d 614 (La.App. 2 Cir.1977). Bohn admitted in the form submitted to the manufacturer that the rear brakes were defective. See Ford Motor Company v. Cockrell, 211 So.2d 833 (Miss., 1968).
A case very similar to this is Garmo v. General Motors Corporation, 45 Mich. App. 703, 207 N.W.2d 146 (1973) where the circumstantial evidence was sufficient to support a jury verdict against the automobile manufacturer. Like Joseph, the plaintiff in Garmo had returned the car to the dealership several times because of difficulty with the braking system. The car had been driven about 8,000 miles and was four and a half months old.[17] Also similar is General Motors Corporation v. Dodson, 47 Tenn.App. 438, 338 S.W.2d 655 (1960) where dealers unsuccessfully attempted to remedy a defect in the brakes and the manufacturer who paid the dealers' bills for those efforts was held to be liable for damages resulting from the failure of the brakes.[18]
*942 Bohn was aware when the van was repeatedly returned to its shop that it was unreasonably dangerous to normal use. The knowledge of the defect by Bohn is imputable to Ford Motor Company, which had independent knowledge of the defect from the warranty claims by Bohn and is, moreover, presumed to know of the defects in its products. Weber, supra; Radalec, supra; Chappuis, supra. Obviously, it could be anticipated that such a defect might cause injury.
The Court of Appeal erred in substituting its judgment for the reasonable inferences made by the trier of fact. It also erred in requiring plaintiffs to negate all causes of the brake failure other than "a defect traceable to the manufacturer." Joseph v. Bohn Ford, Inc., 472 So.2d 185 at 188 (Ct.App. 4 Cir., 1985). The manufacturer is in the best position to produce the technical evidence which would be required to specify the nature of the defect in these brakes. Ford introduced no evidence to indicate that the design and function of the brakes were normal. "The defendants have not produced evidence that the ... [Ford] was manufactured properly." Weber, supra, 259 La. at 609, 250 So.2d at 758. Ford relied solely on a defense of driver and/or dealer error. The dealer, Bohn Ford, had admitted that the brakes were defective long before the accident or any prospect of litigation.
There was evidence from which the jury reasonably concluded that there was an underlying defect in the van which caused the rear brake pads to disintegrate at 7,176 miles, 8,424 miles and 9,787 miles. Even though Bohn Ford was negligent in its attempts to repair the situation, the underlying defect was a cause in fact of the accident. None of the experts could specify the exact nature of the problem. The evidence negates a defect in the proportioning valve on the van, driver error or maladjustment of the parking brake. The negligence of Bohn Ford in using passenger linings in the brakes and reversing the rear brake shoes accelerated the disintegration of the rear brake linings but was not the underlying cause. Despite the fact that plaintiffs could not pin-point the exact nature of the defect, they carried their burden of proving that a defect, which created an unreasonable risk of harm, was a cause in fact of the accident. This is all that the law requires.
In Simon v. Ford Motor Company, 282 So.2d 126 (La., 1973), a ball joint assembly failed in a car with 76,000 miles of service. Plaintiff could not recover against Ford Motor Company, its agents or insurers because there was no proof of why the ball joint failed, i.e., there was no proof of a manufacturing defect in the ball joint. The car mileage alone differentiates that case from this one. Causation can be proved by negative as well as positive evidence. In this instance, plaintiffs' evidence negated any other cause of the van's brake failure other than a defect in the braking system which existed at the time of the vehicle's manufacture. That was not the case in Simon.
The jury reasonably concluded that the damages resulted from a defect in Ford's product, that the product was unreasonably dangerous in normal use, and that the condition existed when the product left the control of the manufacturer, as well as the supplier.
For the foregoing reasons, the judgment of the Court of Appeal on liability is reversed, and the judgment of the trial court is reinstated. The case is remanded for consideration by the Court of Appeal of the award of damages.
REVERSED AND REMANDED.
DENNIS, J., concurs with reasons.
LEMMON, J., concurs in the result, but disagrees with the conclusion that Ford's appeal from the judgment in the case did *943 not include the issue of the dismissal of Kelsey-Hayes during the trial which led to the judgment.
DENNIS, Justice, concurring.
I concur in the result reached by the majority because the plaintiff adequately proved and the jury reasonably found facts subjecting Ford Motor Company to liability which should have been sustained on appeal. My conclusions are based on the ordinary rules for testing sufficiency of evidence, however, because I do not agree with the rule of law pertaining to prima facie cases in automobile litigation which the majority apparently establishes. Moreover, I cannot subscribe to all of the majority's discussion of the law because some of it is inappropriate to the only theory of recovery which is material to our review.
The plaintiff proved that the vehicle was unreasonably dangerous in construction or composition by showing that at the time it left the control of its manufacturer it contained an unintended abnormality or condition which made it more dangerous than it was designed to be and by showing that the accident and damages resulted from this condition. It is generally accepted that when a plaintiff proves such a construction or composition defect, the manufacturer is subject to liability without proof of negligence on its part in creating or failing to discover the flaw. It is also generally accepted that evidence of what knowledge of the danger was available to the manufacturer has no relevance because the product failed to conform to the manufacturer's own standards. See Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (1986); W. Prosser & P. Keeton, On Torts, p. 695 (5th ed. 1984); Wade, Strict Tort Liability of Manufacturers, 19 Sw.L.J. 5 (1965); Keeton, the Meaning of Defect in Products Liability Law, 45 Mo.L.Rev. 579, 586 (1980); 1A Frumer & Friedman, Products Liability 12.07[4] [6] [ii].
The plaintiff is not required to eliminate all other possibilities or to prove his case beyond a reasonable doubt. As on other issues in a civil action, it is enough that he makes out a preponderance of probability. A construction or composition defect, like any other fact, may be proved by circumstantial evidence. See DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La. 1981); Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (La.1971); Prosser & Keeton, supra, p. 696-697. It is not enough that plaintiff's counsel merely suggest a possibility of a defect. The evidence must sustain the burden of proof by making it and its causal link with the damage more likely than not. Prosser & Keeton, supra, p. 269.
In civil cases the better rule is that the burden of producing evidence is satisfied, even by circumstantial evidence, if sufficient facts exist for the jury to say reasonably that the preponderance favors liability. Ultimately, the judge's ruling must necessarily rest on his individual opinion, formed in the light of his own common sense and experience, as to the limits of reasonable inference from the facts proven. C. McCormick, On Evidence, p. 951 (3d Ed.1984).
On appellate review, the court should not disturb the trier of fact's finding, even if based on circumstantial evidence, if, considering all of the evidence, sufficient grounds exist for the jury to say reasonably that the preponderance favors liability. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Cantor v. Koehring Co., 283 So.2d 716 (La.1973); Cf. McCormick, supra. Applying these precepts, I conclude that the plaintiff proved a cause of strict liability based on a construction defect which should have been affirmed on appeal based on the evidence described in the majority opinion. Although the jury had to rely on disputed circumstantial evidence, its decision was within the limits of reasonable inference from the facts proven.
Accordingly, creating a prima facie case by rule of law to sustain the jury's verdict in this case is unnecessary. Moreover, since the rule is not a model of precision, it is apt to be misused. I believe the majority must have intended that the prima facie case will prevent a directed verdict against a plaintiff after he rests and that the rule will also assure submission of the case to the jury if his adversary introduces no evidence. *944 But, if the plaintiff stops and defendant does nothing, I do not think the majority intends for victory to be proclaimed without submitting the case to the jury. A careful reading of the case cited by the majority encourages this interpretation. See Tweedy v. Wright Ford Sales, Inc., 64 Ill.2d 570, 2 Ill.Dec. 282, 357 N.E.2d 449 (Ill.1976). See McCormick, supra, p. 955-956. Otherwise, the rule would represent a drastic and unwarranted reduction of the jury's function in automobile products liability cases. Coming as it does in this court's review of an appellate court's failure to affirm a jury's verdict, however, the majority's broad, unqualified statement of its rule may be misunderstood. I hope that the majority's prima facie case rule will be read narrowly as suggested here or, better yet, entirely disregarded as dicta since it is unnecessary to the decision.
Other language and discussion in the majority opinion are apt to cause confusion because they have no application to the only theory of recovery material to our review. The majority opinion says that the manufacturer is "presumed to know of the vices in the things he makes" and that he "must reasonably have anticipated that the defect might cause injury." The statements are superficially contradictory without explanation which the majority opinion does not supply. More importantly, they are unnecessary and completely out of place, because the negligence or knowledge of the manufacturer is immaterial to the plaintiff's right to recover for injuries caused by a construction or composition defectthe only theory of recovery pertinent to our review.
Also, upon reflection, I find that I should dissent from part of the majority's decision. I disagree with its interpretation of L.C. C.P. art. 1913 to foreclose Ford Motor Company's appeal from the directed verdict in favor of Kelsey-Hayes. The article permits a party, under certain circumstances, to require by request that the clerk mail him notice of any judgment in the case. Ford requested notice of all judgments under the prescribed circumstances. Notice of the judgment of directed verdict in question was not given as required by law. Therefore, Ford contends the delay did not run from the date of the directed verdict and its appeal was timely. I agree with Ford on this issue. The majority incorrectly suggests Art. 1913 requires a specific request of a certain judgment, and the majority creates an exception to the statute where the requesting party has actual knowledge of the signing by virtue of his presence in court at the time. Neither of these narrow and hypertechnical interpretations are warranted by the words or the purpose of the statute. Article 1913 clearly does not prohibit a party from requesting notice as to more than one or as to all judgments to be rendered. Actual knowledge outside the specified judicial process by a party entitled to notice of judgment that a judgment has not been signed should not deprive the party of the very legal safeguard upon which he has relied in lieu of extra diligence and as a protection against oversight. Myer v. Pagan, 439 So.2d 501 (La. App. 1 Cir.1983); Haywood v. Salter, 421 So.2d 1190 (La.App.2d Cir.1982); Arnold v. Arnold, 345 So.2d 1020 (La.App.2d Cir. 1977); Boswell v. Jeff. Cantrell Homes, Inc., 333 So.2d 374 (La.App.2d Cir.1976). Our general policy favoring preservation of appeals requires a generous interpretation of the article in favor of the appellant.
NOTES
[1] "The third-party defendant, Kelsey-Hayes Company, having been dismissed on motion for directed verdict and considering the verdict of the aforementioned jury rendered herein, the law and the evidence being in favor of the plaintiffs; ..." (Tr., Vol. VI, Judgment of January 24, 1984)
[2] LSA-C.C.P. art. 1841 provides:

"A judgment is the determination of the rights of the parties in an action and may award any relief to which the parties are entitled. It may be interlocutory or final.
"A judgment that does not determine the merits but only preliminary matters in the course of the action is an interlocutory judgment.
"A judgment that determines the merits in whole or in part is a final judgment."
[3] LSA-C.C.P. art. 1913, infra, indicates a specific request for a certain judgment is intended, rather than a blanket request.
[4] LSA-.C.C.P. art. 1913 provides:

"Notice of the signing of a default judgment against a defendant on whom citation was not served personally, and who filed no exceptions or answer, shall be served on the defendant by the sheriff, by either personal or domiciliary service.
"Except as otherwise provided by Article 3307, when a case has been taken under advisement by the court notice of the signing of a final judgment therein shall be mailed by the clerk of court of the parish where the case was tried to the counsel of record for each party, and to each party not represented by counsel.
"If, at the conclusion of a trial a case is not taken under advisement but the court does not sign a judgment at the time, a party may make a request of record for notice of the date when the judgment was signed; and when such a request is made, the clerk shall mail such notice to the party requesting it or to his counsel of record.
"The clerk shall file a certificate in the record showing the date on which, and the counsel and parties to whom, notice of the signing of the judgment was mailed.
"Except as otherwise provided in the first three paragraphs of this article, notice of the signing of a final judgment is not required."
[5] "Comments" on the 1968 amendment.
[6] On the merits, the evidence is that the proportioning valve was not defective. An employee of Ford Motor Company took the proportioning valve to Kelsey-Hayes for testing, observed the inspection, testing and evaluation, and concluded that the valve functioned satisfactorily.
[7] Robert Bohn was asked: "The fronts were checked and they were okay?", and answered "yes". (Vol. XIII, p. 201)
[8] The same policeman later followed Joseph on his route, hassled, handcuffed, and arrested him for a traffic violation and resisting arrest. Two children with him were also taken to the police station and the parents told Joseph not to pick up their children any more.
[9] Plaintiffs' Exhibit 6.
[10] He referred to it as the differential proportioning and metering valve.
[11] It was vandalized and stolen after the accident but later recovered.
[12] Vol. XV, p. 95.
[13] Vol. VIII, page 71.
[14] "When the car was examined after the accident, the brake system was found to be defective, but whether this defect had existed at the time the car left the manufacturer or whether it was the result of the dealer's repair work, or the decedent's own misuse, were matters of spirited controversy in the trial of the case." Mahan, supra, at p. 327.
[15] Weber v. Fidelity & Casualty Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971).
[16] "A prima facie case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed `to perform in the manner reasonably to be expected in light of [its] nature and intended function.'" Tweedy, supra, 2 Ill.Dec. at p. 285, 357 N.E.2d at p. 452.
[17] "... the jury could reason [the dealer's repairs] neither cured nor aggravated the problem since the owner's complaints continued as before." 207 N.W.2d at 149.
[18] "Within three or four weeks and before it had been driven 4,000 miles, plaintiffs took the car back to Kemp, the authorized dealer from whom they bought it, and told Kemp about the defective brakes. Time after time plaintiffs took the car to authorized dealers to fix the brakes. They all failed. The evidence shows defendant did breach its contract or warranty. In recognition of that fact, General Motors paid the bills submitted by the dealers who tried to fix the brakes." 338 S.W.2d at 661.