646 So.2d 1019 (1994)
Larry RANDOLPH
v.
GENERAL MOTORS CORPORATION, General Motors Detroit Diesel Allison Division, FMC Corporation, Link Belt, A Division of FMC Corporation, Link Belt Corporation, Link Belt Construction Equipment Company, Reco Crane Company, Inc., United Diesel, Incorporated, Terrebonne Parish Consolidated Government, Terrebonne Parish Police Jury and Terrebonne Parish.
No. 93 CA 1983.
Court of Appeal of Louisiana, First Circuit.
November 10, 1994.
Rehearing Denied December 12, 1994.
*1021 Terrence J. Lestelle, New Orleans, Christopher B. Siegrist, Houma, for plaintiff/appellee Larry Randolph.
Robert P. Cuccia, Houma, for defendants/appellant Terrebonne Parish Consol. Government, Terrebonne Parish Police Jury and Terrebonne Parish.
Sidney C. Sundbery, C. Berwick Duval, II, Houma, for defendant/appellant Terrebonne Parish Consol. Government.
John J. Weigel, New Orleans, for defendant/appellee FMC Corp.
Michael S. Guillory, New Orleans, for intervenor/appellee American Cas. Co.
Camille A. Morvant, II, Thibodaux, for defendant/appellee Reco Crane Co.
Howard B. Kaplan, Metairie, for defendant/appellant General Motors Corp.
James P. Nader, Metairie, for third party defendant/appellees G & W Const. Co., Inc. & Indus. Indem. Ins. Co.
Before EDWARDS, LeBLANC and PITCHER, JJ.
*1022 LeBLANC, Judge.
In this products liability case, defendants appeal from a judgment awarding plaintiff $475,860.20 for personal injuries.

FACTS
Plaintiff, Larry Randolph, was employed to operate a dragline owned by defendant, Terrebonne Parish Consolidated Government (Parish), pursuant to a contract with plaintiff's employer, G & W Construction, to furnish the Parish with a dragline operator. The dragline's diesel engine was manufactured by defendant, General Motors Corporation (GM) in 1978. The dragline was subsequently purchased used by the Parish in 1983.
On October 8, 1986, while checking the dragline preparatory to beginning work, plaintiff noticed that the gantry pin was displaced. While standing on the dragline's counterweight, attempting to re-insert the pin, plaintiff was startled by a loud noise from the dragline engine, which immediately went into "overspeed". Plaintiff fell off the dragline, striking his head and feet on the wooden mat on which the dragline was positioned.
Plaintiff was treated that day by Dr. Leslie Walker for complaints of pain in his heels and ankles. Dr. Walker treated plaintiff for contusions to both heels, discharging him to return to work on October 13, 1986. Thereafter, plaintiff worked for G & W, without interruption, through May 21, 1987.
Shortly after plaintiff's accident, a parish mechanic, Mr. Douglas Eskind, determined that the cause of the engine malfunction was the failure of the engine's governor. After removing the failed governor, Mr. Eskind attempted to have it fixed at a repair shop, but was told that it could not be repaired. He purchased a new governor and placed it in the dragline. He explained that he then took the old governor and placed it on the counter of the parish workshop. At trial he was unable to say what had happened to the governor, but indicated it may have been thrown away.
On May 16, 1987, plaintiff saw Dr. Walker for complaints of leg pain. Dr. Walker's diagnosis was intermittent claudication, which is an arteriosclerotic change of the blood vessels in the leg; he referred plaintiff to a surgeon for an angiogram and evaluation.
According to plaintiff's trial testimony, as he attempted to step up onto a motor grader on May 21, 1987, while working for G & W, his right leg locked up and he fell back a short distance to the ground. The following day was the last day plaintiff worked for G & W, and he has not worked since that time.
On May 25, 1987, plaintiff was hospitalized for problems totally unrelated to his legs and back. While hospitalized, he complained to his doctors for the first time of back pain. Plaintiff began treatment for back pain and ultimately underwent two disc surgeries.
The present suit was filed by plaintiff against GM, the Parish and several other parties not parties to this appeal.

ACTION OF THE TRIAL COURT
A bifurcated trial was held, with the jury deciding the case as to GM and the judge determining the Parish's liability.
Following trial, the jury was provided with special interrogatories, which it answered as follows:
1. Was the GENERAL MOTORS CORPORATION engine defective at the time of LARRY RANDOLPH'S October 8, 1986 accident? Yes
2. Was the GENERAL MOTORS CORPORATION engine defective in 1978, when it left the custody and control of GENERAL MOTORS CORPORATION? No
3. Was a defect in the GENERAL MOTORS CORPORATION engine a legal cause of any injuries sustained by LARRY RANDOLPH? Doesn't apply
4. Was the fault of TERREBONNE PARISH a legal cause of any injuries sustained by LARRY RANDOLPH? Yes
5. Was the fault of LARRY RANDOLPH a legal cause of any injuries which he sustained? No

*1023 6. Express (in terms of a percentage) the degree of fault, if applicable, of each of the following persons for any injuries sustained by LARRY RANDOLPH:

GENERAL MOTORS CORPORATION 20%
TERREBONNE PARISH 80%
LARRY RANDOLPH 0%
 TOTAL 100%

7. What amount of damages, if any, did LARRY RANDOLPH sustain for the following: (Do not deduct for percentages of fault of the parties, the Court shall do this.)

a. Past and future physical
 and mental pain and suffering $ 21,000.00
b. Past medical expenses $ 34,000.00
c. Future medical expenses $ 30,000.00
d. Past lost wages $100,000.00
e. Future lost wages $ 50,000.00
f. Disability $ 15,000.00

The trial court instructed the jury that its answers to interrogatories 2, 3, and 6 were inconsistent and sent the jury back for further deliberations regarding these questions. The jury returned with the same responses to interrogatories 2 and 6, but in response to interrogatory 3 indicated that a defect in the GM engine was a legal cause of plaintiff's injuries. The trial court instructed the jury that its answers to interrogatories 2 and 6 were still inconsistent and again sent the jury back for further deliberations. Thereafter, the jury returned, answering yes to interrogatory 2, indicating the engine was defective when it left GM. The jury assessed GM with 20% fault.
After taking the matter under advisement, the trial court rendered a judgment on August 18, 1992, finding the Parish's negligence was 50% at fault in causing plaintiff's injuries. The court found plaintiff free from fault and fixed his damages as follows:

Past and future physical & mental
pain and suffering $105,000.00
Past medical expenses $ 34,092.75
Future medical expenses $ 30,000.00
Lost past wages $118,621.45
Future loss of wages $143,146.00
Disability $ 45,000.00
 ___________
Total $475,860.20

The final judgment rendered by the court made both the trial court's judgment and the jury's verdict the judgment of the court.
Thereafter, pursuant to plaintiff's motion, the trial court granted a judgment notwithstanding the verdict (JNOV), and held GM 50% at fault and the Parish 50% at fault. The JNOV also awarded plaintiff damages in accordance with the trial court's original assessment of damages. The trial court denied motions for new trial filed by plaintiff and the Parish. GM and the Parish have now appealed this judgment.
ISSUES
1. Whether the trial court erred in granting a JNOV to reconcile its judgment with the jury's verdict?
2. Whether the trial court erred in finding the governor was defective when it left GM's control?
3. Whether the trial court erred in applying the theory of spoliation of the evidence to impose liability on the Parish?
4. Whether the trial court erred in finding plaintiff's disc injury was caused by the accident of October 8, 1986?
5. Whether the trial court erred in awarding excessive costs against GM?

JNOV
GM argues the trial court erred in granting a JNOV in the present case. We disagree, concluding the JNOV was properly granted under the circumstances.[1]
In the instant case, the trial court and the jury each found plaintiff to be free from fault. The jury additionally found GM to be 20% at fault. However, the trial court concluded the Parish was only 50% at fault, leaving the remaining 50% fault to be assessed against GM, contrary to the jury's assessment of 20% fault. Moreover, the amounts awarded in the jury verdict and the trial court judgment were inconsistent regarding several items of damages. Under these circumstances, the trial court did not *1024 err in granting a JNOV to reconcile its findings with those of the jury. In a bifurcated trial where the jury and the judge reach different findings as to the liability of private and public defendants, a JNOV is a proper means of reconciling the two verdicts. Dean v. Terrebonne Parish Police Jury, 510 So.2d 82, 86 (La.App. 1st Cir.1987); Ourso v. Grimm, 92-1274 (La.App. 3rd Cir. 1/5/94), 630 So.2d 963, 965, writs denied, 94-0346 (La. 3/25/94), 635 So.2d 230 and 94-0339 (La. 3/25/94), 635 So.2d 231. See also, Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308, 1310 (La.1984).

DEFECT IN GOVERNOR
GM contends that the trial court erred in finding that the governor manufactured by GM was defective at the time it left GM's control in 1978.
In order to recover from a manufacturer under the theory of strict products liability, a plaintiff must prove by a preponderance of the evidence: (1) that the injury resulted from the condition of the product; (2) that the condition made the thing unreasonably dangerous to normal use; and (3) that the condition existed at the time the product left the control of the manufacturer. Bell v. Jet Wheel Blast, Div. of Ervin Ind., 462 So.2d 166, 168 (La.1985); Johnston v. Hartford Ins. Co., 623 So.2d 35, 36 (La.App. 1st Cir.), writ denied, 626 So.2d 1170 (1993).[2] If the plaintiff's evidence is sufficient to establish the product was defective by reason of its hazard to normal use, the plaintiff need not prove the precise nature of the defect. Joseph v. Bohn Ford, Inc., 483 So.2d 934, 940 (La.1986); Hunt v. Ford Motor Co., 341 So.2d 614, 618 (La.App. 2nd Cir.1977). In fact, identification of the specific defect is often impossible for the plaintiff to prove. Joseph, 483 So.2d at 940.
A manufacturing defect may be established by circumstantial evidence. Joseph, 483 So.2d at 940. Proof by either direct or circumstantial evidence is sufficient to constitute a preponderance when, taking the evidence as a whole, it shows that the fact or causation sought to be proved is more probable that not. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993).
The governor alleged to be defective in this case was unavailable for examination by the parties' experts. The Parish, which last had possession of the governor through its employees, was unable to produce it either for pretrial examination or at trial. Mr. Eskind, the parish mechanic who repaired the dragline, testified he placed the mangled governor on a shop counter and never saw it again. He indicated it may have been thrown away. However, metal fragments from the failed governor were recovered years later when the engine was taken apart by several of the experts involved in this litigation. These fragments assisted the experts in reaching their conclusions. One of GM's experts specifically testified that the available evidence was sufficient to allow the formulation of an opinion as to the cause of the governor's failure.
Both the plaintiff and defense experts in this matter agreed on several crucial points regarding the failure. For instance, all experts agreed that the loud noise and the racing of the engine which startled plaintiff was caused by the sudden failure of the governor's weight-shaft bearing, which in turn caused the failure of the governor. The experts were also unanimous, even taking into account the engine's age and prior use, that this failure was premature. However, the experts disagree as to the cause of the initial failure of the weight-shaft bearing.
The testimony of plaintiff's experts, as well as that of the expert presented by the Parish, indicated that there were three possible causes of the failure of the weight-shaft bearing: 1) a manufacturing defect in the bearing; 2) damage upon assembly; and, 3) improper installation. They indicated they were unable to determine definitely which of these three possibilities was the cause of the failure because of the unavailability of the governor for inspection. However, each expert expressed an opinion as to which of the *1025 three possibilities, each of which was attributable to GM, was the most likely cause.
In opposition, the defense experts opined that there were generally two main reasons for bearings to fail: lack of proper lubrication and/or dirt and debris. However, the experts found no evidence to support the possibility of improper lubrication, and one defense expert specifically conceded that it was probably not the cause in this case due to the fact that the engine was running well prior to the governor's failure. Further, the metal fragments recovered from the engine showed none of the signs normally associated with improper lubrication. Moreover, the defense experts' opinions that the failure was probably due to dirt and debris getting into the engine were based primarily on the fact that when Mr. Eskind examined the dragline after plaintiff's accident, the end cap was not on the governor. The defense experts extrapolated from the fact that the end cap was off the governor after the failure that it must also have been off prior to the failure. They theorized that this allowed dirt and debris to get inside the governor, ultimately leading to its failure. However, the record is devoid of any evidence that the end cap was off prior to the governor's failure. Plaintiff and the other G & W employees who worked on the dragline testified that they never saw the end cap off of the governor prior to the incident in question. Further, although disputed by the defense experts, plaintiff's experts opined that the mechanical force of the failure itself could have caused the end cap to come off the governor.
In its detailed reasons for judgment, the trial court made the following findings of fact.
This particular Linkbelt Crane and Dragline was originally purchased from FMC in 1983, by RECO CRANE. GMC was the manufacturer of the diesel engine in the dragline. It's first consignment was from March 1st, 1981 to September 1983. RECO CRANE rented the dragline to two companies. There was ample testimony from the representatives from RECO that there were no complaints of the governor, no alterations by these companies that it rented the crane to, and that they inspected the crane prior to the sale to the TERREBONNE PARISH CONSOLIDATED GOVERNMENT in 1983 (and that they made no alterations and received no alterations or complaints from the PARISH). Further testimony at the trial showed that TERREBONNE PARISH CONSOLIDATED GOVERNMENT, although on a spotty but regular basis, maintained the dragline; and all of the testimonyin particular, the testimony of the plaintiff himself, who had operated it for sometime; and by the swamper-oilers, who on a regular basis oiled and greased the dragline claimed there were no mechanical problems with the engine containing the governor that failed in this case.
The Court finds as a finding of fact that the intervening time between the date of the original manufacture and the date of the accident has been reasonably explained, and the plaintiff has carried his burden of proof pursuant to Norris v. Bell Helicopter Textron, 495 So.2d 976, 978 (La. App. 3 Cir.1986).
The Court noted that all of the experts testified at the trial on the merits that the engine suffered a sudden premature catastrophic failure of the weight-shaft bearings in the governor, causing the governor to malfunction, and thereby causing the engine to overspeed. As testified by the experts, the governor was a self-contained and self-enclosed system, and due to this, it did not require separate oiling but rather received its lubrication from the normal oil coming from the engine.
The plaintiff himself testified that the dragline and engine were working very smoothly for an extended period of time up until the time of the accident. The oilers and swampers testified that they did not notice any type of oil leakage, which would have occurred if the end-cap was missing from the governor nor did they notice any oil blowing from the blower, which would come from an oil leakage. It should be pointed out that if the end-cap was missing, this oil leakage would have been very slow and would have taken an extended period of time before the engine would have shown the signs of the oil leakage.

*1026 Although the accident occurred October 8th of 1986, and an independent examination of the governor and its parts did not occur until 1990, it is noted by the Court that certain small pieces of the governor were retrieved, including pieces of the bearing cases, during the 1990 examination. All of the tests run on the recovered pieces indicated that there was no failure of lubrication, and that a lack of lubrication was not a cause of the failure of the main weight-shaft bearing; and this is a specific finding by this Court.
All of the experts testified that the main weight-shaft bearing failure was premature before its time. The preponderance of the evidence indicated and proved that the governor should have the same work life, if not longer that the GMC engine itself. The overwhelming and preponderance of the evidence was that this weight-shaft bearing failed long before its time.
It is a finding of fact by this Court that the governor and its component parts, including the weight-shaft bearing and Andrews bearing, contained a manufacturer's defect which existed at the time of its manufacture by GMC; that at the time of the accident to Mr. RANDOLPH, on October 8th, 1986, this product was in its normal use; that at the time of the accident, on October 8th, 1986, that the product was unreasonably dangerous in that use; and as previously stated by this Court, the plaintiff's injuries which were caused by this accident were caused by this defect.
Based on our review of the record, in light of the reasons for judgment given by the trial court, we find no manifest error in the trial court's finding that the governor was defective at the time it left GM's control.[3] Even when an appellate court feels its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where there is conflicting testimony. Stobart v. State through the Dept. of Transp. and Development, 617 So.2d 880, 882 (La. 1993). The evidence presented by plaintiff was sufficient to meet his burden of proof on this issue by a preponderance of the evidence.

SPOLIATION OF THE EVIDENCE
The trial court imposed 50% liability on the Parish under the theory of spoliation of the evidence because the Parish was unable to produce the original governor which was in the dragline engine at the time of plaintiff's accident. GM contends the Parish should have been assessed with 100% liability since the unavailability of the governor made it impossible to establish the exact cause of the failure. In opposition, the Parish argues the trial court erred in imposing any liability on it.
In imposing liability upon the Parish, the trial court gave the following reasons:
A failure of a litigant to produce evidence within his reach raises a presumption that evidence would have been detrimental to his case. However, this presumption is not applicable when failure to produce the evidence is explained. This must be a reasonable explanation. Babineaux v. Black, 396 So.2d 584 (La.App. 3 Cir.1981).
The presumption of spoliation is not applicable when the failure to produce the evidence has a reasonable explanation. Babineaux v. Black, 396 So.2d 584 (La. App. 3 Cir.1981). Bourgeois v. Bill Watson Investment, Inc., 458 So.2d 167 (La. App. 5 Cir.1984). McElroy v. Allstate Insurance Company, 420 So.2d 214 (4 Cir. [1982])
The TERREBONNE PARISH CONSOLIDATED GOVERNMENT argues that their explanation of their failure to produce the damaged governor parts at the time of the trial was reasonably explained.
The accident date on which Mr. RANDOLPH fell was October 8th, 1986. The next day, Mr. Eskind removed the governor from the dragline and presented it to *1027 United Diesel for repair. United Diesel said that the governor was unrepairable in its condition. Mr. Eskind then returned the governor to the PARISH's Foreman Shop on October 9, 1986. The governor and its parts have not been seen again.
The PARISH contends that they were unaware of any allegations of defects in the governor as evidenced by Mr. RANDOLPH's return to work the next day. Further, PARISH contends that a lawsuit, alleging such a defect and thereby giving legal notice, was not filed until October 6th, 1987, and that it wasn't until three-and-a half years later, after the accident, did a party request an inspection of the dragline. The PARISH contends this is a reasonable explanation as to why the parts were disposed of by the PARISH and, therefore, the presumption should not apply.
As stated before, James Verret, the oiler and swamper assigned to the dragline at the time of the accident, brought Mr. RANDOLPH in to receive medical treatment. Upon reaching the landing with Mr. RANDOLPH, he called his superiors to inform them of the accident and that Mr. RANDOLPH was receiving medical treatment. Mr. Eskind when he came out to determine the problem with the dragline, noticed Mr. RANDOLPH limping. Further, Mr. Eskind had determined that the governor had failed and was informed that it could not be repaired. It can be inferred that the governor was disposed of by some unknown party or person and therefore was not available for trial.
All of the evidence that was presented at the trial indicates that the TERREBONNE PARISH CONSOLIDATED GOVERNMENT on/or about October 8th, 1986, had knowledge that Mr. RANDOLPH was injured and had knowledge that the failed governor was the cause of the unusual racing or speeding-up of the engine which, in turn, caused this accident. From this, the TERREBONNE PARISH CONSOLIDATED GOVERNMENT had enough information for it to know or presume that some type of claim for either workman's compensation, medical reimbursement, and/or personal injuries may be made by Mr. RANDOLPH for the alleged injuries he received from this accident. However, the Court notes that the TERREBONNE PARISH CONSOLIDATED GOVERNMENT has cited several cases for the proposition that as long as the PARISH GOVERNMENT can reasonably explain the failure to produce the evidence at the trial, this presumption cannot be used against it. The Court finds as a finding of fact that it was unreasonable for the TERREBONNE PARISH CONSOLIDATED GOVERNMENT to have disposed of the failed governor in this case.
There is no reasonable explanation for the failure of the TERREBONNE PARISH CONSOLIDATED GOVERNMENT in this case to have disposed of the governor. The only explanation for the disposal of the governor is either the negligence of the PARISH and/or intentional disposal. The whole purpose of the spoliation rule of evidence is to prevent one party from hiding, whether intentionally or by negligence, relevant evidence which would assist the trier of fact in ascertaining the truth in the dispute between the individual parties.
We find that the trial court imposition of liability upon the Parish under the theory of spoliation of evidence was clearly wrong since the record does not indicate there was an intentional destruction of evidence by the Parish for the purpose of depriving the opposing parties of its use. See, Kammerer v. Sewerage & Water Bd., 93-1232 (La.App. 4th Cir. 3/15/94), 633 So.2d 1357, 1358, writ denied, 94-0948 (La. 7/1/94), 639 So.2d 1163. Furthermore, the presumption that evidence which a litigant fails to produce is detrimental to his case, is not applicable when the failure to produce the evidence is adequately explained. Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167, 172 (La.App. 5th Cir.1984); Babineaux v. Black, 396 So.2d 584, 586 (La.App. 3rd Cir.1981).
We find the trial court's conclusion that the Parish did not provide a reasonable explanation for its failure to produce the governor is clearly wrong. While the Parish was unable to explain precisely what happened *1028 to the governor, the overall circumstances indicate it was discarded because it could not be repaired. Although the Parish had notice that plaintiff was injured, the fact that plaintiff returned to work within a few days and worked without interruption for over seven months could reasonably have diminished any expectation of potential claims or litigation. The present suit, alleging a defect in the governor, was not filed until almost one year after the accident, and the first request to examine the governor was not made until substantially later. Finally, we note that while its unavailability made it impossible for the experts to reach a definitive conclusion as to why the governor failed, there was enough available evidence for the experts to render opinions as to the most probable cause of the failure.
Considering these circumstances, the Parish's explanation for its failure to produce the governor was adequate. The trial court erred in imposing liability on the Parish on the basis of spoliation of the evidence.[4] Accordingly, we reverse that portion of the trial court judgment imposing 50% liability on the Parish.

MEDICAL CAUSATION
In brief, GM asserts plaintiff failed to carry his burden of proving medical causation.
The record reveals that plaintiff was treated by Dr. Leslie Walker for numerous health problems, including circulatory problems, prior to the October 8, 1986, accident in question. On the date of the accident, plaintiff was treated by Dr. Leslie Walker for contusions to both heels. Plaintiff saw Dr. Leslie Walker again on October 10 and on October 13, 1986, at which time plaintiff was discharged to return to work. Although plaintiff continued to work for G & W, without interruption, through May 21, 1987, he testified that he continued to experience intermittent pain, which began moving up his legs, throughout this period. Plaintiff's wife and two co-workers confirmed that plaintiff frequently complained of pain in his legs during this period.
On May 16, 1987, plaintiff saw Dr. Walker for complaints of leg pain. Dr. Walker's diagnosis at that time was intermittent claudication, which is an arteriosclerotic change of the blood vessels in the leg; he referred plaintiff to a surgeon for an angiogram and evaluation.
At trial, plaintiff testified that while he was at work on May 21, 1987, he attempted to step up onto a motor grader and his right leg locked up. Plaintiff fell back a short distance to the ground. The following day was the last day plaintiff worked for G & W, and he has not worked since that time.
On May 25, 1987, plaintiff was hospitalized for problems unrelated to his legs and back. While hospitalized, he complained to his doctors for the first time of back pain. Plaintiff became treatment for his back at that time and ultimately underwent two disc surgeries. As a result, plaintiff was left with a 10-15 percent permanent disability.
The trial court found that the injuries plaintiff complained of at trial were caused by the accident which occurred on October 8, 1986. Causation is a question of fact to be determined by the trier-of-fact. This determination is entitled to great weight and can not be disturbed in the absence of manifest error. Harrigan v. Freeman, 498 So.2d 58, 62 (La.App. 1st Cir.1986). While this court probably would have reached a different conclusion if it had been the trier-of-fact, we can not say that the trial court's conclusion was manifestly erroneous. Dr. Christopher Cenac, who saw plaintiff for evaluation, opined that the October 8, 1986 accident was the cause of plaintiff's disc injury, as opposed to the fall on May 21, 1987. Further, Dr. Del Walker, the orthopedic surgeon who performed plaintiff's two surgeries, testified that, while it would be unusual to have a disc injury without back pain for over seven months, the symptoms of leg pain described by plaintiff were consistent with a disc injury. He stated that he has previously *1029 had disc injury patients who experienced only leg pain without pain in the back. Moreover, although Dr. Leslie Walker believed plaintiff's leg pain on May 16, 1987, was due to intermittent claudication, the record does not indicate this diagnosis was ever confirmed during plaintiff's subsequent hospitalization and treatment. Considering the evidence as a whole, we find the trial court's conclusion that medical causation was established by a preponderance of the evidence was a permissible view of the evidence. See, Stobart, 617 So.2d at 882.

DAMAGES
In the alternative, GM argues that even if plaintiff did establish medical causation, the trial court erred in granting a JNOV as to damages. Specifically, GM argues the trial court erred in increasing plaintiff's awards for lost future wages from $50,000.00 to $142,146.00, the award for disability from $15,000.00 to $45,000.00, and the award for past and future mental pain and suffering from $21,000.00 to $105,000.00.
We have already concluded in this opinion that the trial court properly granted a JNOV to reconcile its judgment with that of the jury. Once it is determined that a JNOV was properly granted, an appellate court should not disturb the trial court's damage awards unless the court abused its broad discretion in fixing the amount of the awards. Hutchinson v. Wal-Mart, Inc., 573 So.2d 1148, 1153 (La.App. 1st Cir.1990). We find no abuse of discretion in the present case.
Plaintiff testified that he has continued to experience pain in his legs since the October 8, 1986 accident and has experienced pain in his back since May of 1987. The record reveals that plaintiff underwent two disc surgeries at L5-S1 and L4-5, respectively, and may ultimately require fusion surgery. He has a permanent disability to 10-15 percent. Given these facts, we believe the $105,000.00 award for general damages and the $45,000.00 disability award were well within the trial court's discretion.
With regard to the award for future lost wages, we note that Dr. Walker stated that plaintiff was capable of returning to work performing light or sedentary type activities, but was not capable of returning to work as a heavy equipment operator. Plaintiff is restricted from certain activities including lifting over thirty (30) pounds and prolonged sitting. The testimony of Tom Meunier, a vocational rehabilitation counselor, indicated that due to plaintiff's age (57 at the time of trial), limited education, marginal reading ability and physical limitations, at best plaintiff would be able to find only minimum wage employment, if any. Under these circumstances, we find no abuse of discretion in the award made for future lost wages, which was based on an economist's estimate which assumed plaintiff would be capable of minimum wage employment.

COSTS
GM argues the expert witness fees awarded to plaintiff's experts were excessive. Specifically, GM disputes the following awards: (1) Mr. Seymour Goodman, Ph.D. (expert economist)-$937.50; (2) Mr. Ryan Uhlich (qualified as an expert in marine surveyor diesel engine failure analysis)-$1,072.50; and (3) Mr. Gary Paulson, Ph.D. (qualified as an expert in metallurgical science, material analysis, engineering and specific failure analysis)-$1,200.00.
On appeal a trial court's award of expert witness fees should not be set aside absent an abuse of discretion. Autin's Cajun Joint Vent. v. Kroger Co., 93-0320 (La. App. 1st Cir. 2/16/94), 637 So.2d 538, 544, writ denied, 94-0674 (La. 4/29/94) 638 So.2d 224. Factors to be considered by the trial court in setting an expert witness fee include: the time spent testifying at trial, time spent in preparatory work for trial, time spent away from regular duties while waiting to testify, the extent and nature of work performed, and the knowledge, attainments and skill of the expert. Additional considerations include the helpfulness of the expert's testimony to the trial court, the amount in controversy, the complexity of the problem addressed by the expert and awards to experts in similar cases. Mack v. Transport Ins. Co., 577 So.2d 112, 119 (La.App. 1st Cir.1991). Considering these factors in light of the discretion *1030 accorded the trial court in this area, although the awards made in the present case may be somewhat high, we are unable to say they constitute an abuse of the trial court's discretion.
Lastly, GM complains with regard to the lab-related fees with which it was assessed as costs. It maintains that these fees should be deleted under the guidelines of Mack v. Transport Ins. Co., 577 So.2d 112 (La.App. 1st Cir.1991). The fees in question relate primarily to the metal fragments from the original governor which were recovered from the dragline engine. The information obtained and the conclusions drawn by the experts from these fragments constituted significant evidence at trial. We disagree with GM's assertion that the trial court erred in including these fees as costs under the guidelines of Mack.

CONCLUSION
For the reasons assigned, that portion of the trial court judgment imposing 50% liability on the Parish of Terrebonne is reversed and judgment is hereby rendered dismissing plaintiff's claims against the Parish of Terrebonne. That portion of the judgment making the Parish liable, in solido, for the payment of court costs is also reversed. Further, the judgment of the trial court is amended to increased the assessment of liability to the General Motors Corporation from 50% to 100%. The judgment of the trial court is affirmed in all other respects. General Motors Corporation is to pay all trial court and appeal costs in this matter.
AFFIRMED IN PART; AMENDED IN PART; AND, REVERSED IN PART AND RENDERED.
NOTES
[1] In view of our conclusion that the JNOV was proper, we pretermit the issue raised by GM regarding an alleged flaw in the jury interrogatories.
[2] The Louisiana Products Liability Act (La.R.S. 9:2800.51 et seq.), which has prospective effect only, is not applicable herein since it did not become effective until September 1, 1988, subsequent to plaintiff's accident. Gilboy v. American Tobacco Co., 582 So.2d 1263, 1264-65 (La.1991).
[3] Having determined that the JNOV was properly granted herein, the manifest error rule is applicable in reviewing the trial court's subsequent factual findings. Dean, 510 So.2d at 87; Ourso, 630 So.2d at 966.
[4] In view of this result, we pretermit the Parish's additional argument that the trial court erred in denying its motion for new trial.