**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 24, 2011

No. 10-50283

Lyle W. Cayce
Clerk

MARYLAND CASUALTY COMPANY,

Plaintiff–Appellee

v.

ACCEPTANCE INDEMNITY INSURANCE COMPANY,

Defendant–Appellant

Appeal from the United States District Court
for the Western District of Texas

Before KING, DAVIS, and SOUTHWICK, Circuit Judges.

KING, Circuit Judge:

This case arises from Appellant Acceptance Indemnity Insurance Company's refusal to defend and indemnify its insured in an underlying lawsuit in Texas state court. Appellee Maryland Casualty Company defended and settled that lawsuit on behalf of their common insured, and then sued Acceptance in diversity to recover Acceptance's share of those costs under theories of contribution and subrogation. Acceptance moved for summary judgment on all of Maryland's claims. The district court found that Acceptance had a duty to defend its insured. It dismissed Maryland's claim for contribution, but the subrogation claim went to trial and the jury rendered a verdict against

No. 10-50283

Acceptance, which the district court upheld against Acceptance's post-verdict challenges. We affirm.

BACKGROUND

In 2002, Hugh McGee hired Russell Guidry d/b/a Olympic Pools ("Guidry") to build a "negative edge" swimming pool at McGee's home in Lakeway, Texas. The pool underwent several repairs over the next few years as four leaks and a large crack developed. In April 2003, just after the pool had been completed and filled with water for the first time, there was a leak under the northeast flower-bed planter. Guidry repaired that leak. In March 2005, the second and third leaks occurred: one in the pump/equipment area, and another under the pool shell near the main drain. The leak under the pool shell caused the pool level to drop twenty-four inches in sixteen hours, eventually draining the pool within two days. After the pool had drained, McGee's property manager noticed a long crack running the length of the negative-edge wall across the basin. A different company was hired to fix the leak under the shell and to chisel, epoxy, and re-plaster over the crack. The fourth leak occurred in August or September 2005, after which McGee hired an engineer to analyze the pool structure.

In December 2006, McGee filed suit against Guidry in Texas state court, alleging that Guidry and his subcontractors had failed to exercise ordinary care in designing and building the pool, resulting in physical damage to and loss of use of the pool and other damage due to leaks. Guidry tendered McGee's claim to two insurers, Maryland Casualty Company ("Maryland") and Acceptance Indemnity Insurance Company ("Acceptance"), which had issued four separate commercial general liability policies to Guidry as follows:

| Insurer: | Effective Dates: |
| --- | --- |
| Maryland | May 11, 2002 to May 11, 2003 |
| Acceptance | August 11, 2003 to August 11, 2004 |
| Acceptance | August 25, 2004 to August 25, 2005 |
| Acceptance | September 9, 2005 to September 9, 2006 |

2

No. 10-50283

Maryland agreed to defend Guidry, but Acceptance denied any obligation to defend or indemnify Guidry against McGee's claims. Maryland eventually paid $590,000 to settle the lawsuit in exchange for a full and final release of McGee's claims. Maryland then brought an action against Acceptance in federal court, requesting a declaration that Acceptance owed a duty to defend and indemnify Guidry, and seeking—under theories of contribution, contractual subrogation, and equitable subrogation—Acceptance's pro rata share of the costs that Maryland incurred to defend and settle McGee's claims.

Acceptance moved for summary judgment on April 2, 2009, arguing that it had no duty to defend and that the Texas Supreme Court's holding in *Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.*, 236 S.W.3d 765 (Tex. 2007), barred Maryland's claims for subrogation and contribution. The district court held that Acceptance had a duty to defend, and that Maryland was therefore entitled to recover a pro rata portion of its defense costs. The court granted Acceptance summary judgment on the contribution claim but denied summary judgment on the subrogation claim, distinguishing *Mid-Continent* on the grounds that Acceptance completely refused to defend and indemnify its insured, and that Maryland and Acceptance were not co-insurers because they issued separate, consecutive policies that did not provide overlapping coverage for the same claim.

The surviving subrogation claim went to trial on October 19, 2009. At the close of Maryland's evidence, Acceptance orally moved for a directed verdict on the ground that Maryland's claim for subrogation was precluded by *Mid-Continent.* The court denied the motion after the case was submitted to the jury. The jury found that the property damage that was the basis of McGee's underlying lawsuit was an "occurrence" covered by Acceptance's policy, and that 75% of the $590,000 paid by Maryland to settle McGee's claims was paid to resolve claims for property damage that first occurred during one of Acceptance's

No. 10-50283

policy periods. The jury also found that the damage to the pool had not been caused by the subsidence of land, and that none of the $590,000 paid to settle the claim was paid to resolve punitive or exemplary damages, thereby rejecting two of Acceptance's policy exclusions.

On November 5, 2009, Acceptance moved for judgment notwithstanding the verdict. Acceptance asserted three grounds in support of its motion: (1) *Mid-Continent* precluded Maryland's claim for subrogation; (2) the evidence was insufficient to support the jury's determination, in Question Two, that some of the property damage first occurred during one of Acceptance's policy periods; and (3) the evidence was insufficient to support the jury's determination, in Question Four, that the property damage at issue was not caused by subsidence of earth. The court declined to revisit the first argument, which it had previously rejected in denying Acceptance's motions for summary judgment and for directed verdict, and refused to address the last two arguments because Acceptance failed to raise them in a Rule 50(a) motion before the case was submitted to the jury, raising them instead for the first time in a post-trial Rule 50(b) motion. The court therefore denied Acceptance's motion for judgment as a matter of law and entered final judgment against Acceptance on December 16, 2009, awarding Maryland damages for Acceptance's separate failures to defend and to indemnify Guidry.

On December 24, 2009, Acceptance moved for a new trial pursuant to Rule 59. Acceptance first contended that the jury's verdict—specifically, its answers to Questions Two and Four—was against the great weight of the evidence. Second, Acceptance argued that the court improperly charged the jury by failing to include Acceptance's alternate proposed definition of an "occurrence" in its instructions. Finally, Acceptance reiterated its argument that *Mid-Continent* barred Maryland's claim for subrogation. The court denied the motion on February 24, 2010, finding that the jury's conclusions as to Questions Two and

No. 10-50283

Four were not against the great weight of the evidence, that the court did not err in its jury charge, and again declining to revisit the subrogation issue. On March 22, 2010, Acceptance appealed "from the Final Judgment entered in this action on the 16th day of December, 2009."

## DISCUSSION

### I.   Jurisdiction Over Motion for New Trial

We first consider whether we have jurisdiction to review the district court's order denying Acceptance's motion for new trial. *See Said v. Gonzales*, 488 F.3d 668, 670–71 (5th Cir. 2007) ("We must raise the issue of our appellate jurisdiction *sua sponte*, if necessary."). Because Acceptance did not appeal that order, we find that we do not.

Federal Rule of Appellate Procedure 3(c)(1)(B) states that the notice of appeal must "designate the judgment, order, or part thereof being appealed." "Rule 3's dictates are jurisdictional in nature, and their satisfaction is a prerequisite to appellate review." *Smith v. Barry*, 502 U.S. 244, 248 (1992). "The designation in the notice of appeal of the final order or judgment does not usually include any orders that are entered after the final judgment. An amended notice of appeal or a second notice of appeal is required to raise these later issues." 20 James W. Moore et al., Moore's Federal Practice § 303.21[3][c][iv], at 48–48.1 (3d ed. 2010); *see also* 16A Charles Alan Wright et al., Federal Practice and Procedure § 3949.4, at 126–28 (4th ed. 2008) (same).

Acceptance's notice of appeal clearly states that it is appealing "from the Final Judgment entered in this action on the 16th day of December, 2009." The notice of appeal does not, on its face, include the district court's February 24, 2010 post-judgment order denying Acceptance's motion for new trial. Although "[a] mistake in designating orders to be appealed does not bar review if the intent to appeal a particular judgment can be fairly inferred and if the appellee is not prejudiced or misled by the mistake," *New York Life Ins. Co. v. Deshotel*,

No. 10-50283

142 F.3d 873, 884 (5th Cir. 1998), we cannot infer any intent here to appeal the February order given that it was entered well before Acceptance filed its notice of appeal on March 22, 2010. *See Capital Parks, Inc. v. Se. Adver. and Sales Sys., Inc.*, 30 F.3d 627, 630 (5th Cir. 1994) (refusing to consider the denial of a post-judgment motion where the notice of appeal, even though filed after that denial, explicitly appealed only from the final judgment without mentioning the denial of the post-judgment motion).

Because Acceptance did not properly appeal the district court's denial of its motion for new trial, we lack jurisdiction to review that order. *See Funk v. Stryker Corp.*, 631 F.3d 777, 780–81 (5th Cir. 2011) (finding that we lacked jurisdiction to consider an argument first raised in a post-judgment motion because the district court's order denying that motion was not properly appealed). We therefore limit our review to Acceptance's appeal of the final judgment, in which Acceptance challenges the sufficiency of the evidence to support the jury's verdict as to Questions Two and Four; the omission of its proffered definition of "occurrence" in the jury instructions; and the availability of a claim for subrogation under *Mid-Continent*. We address these challenges in reverse order.

## II.    Availability of a Claim for Subrogation under *Mid-Continent*

Acceptance argues that the Texas Supreme Court's decision in *Mid-Continent* bars Maryland from recovering from Acceptance under a theory of subrogation because Guidry, their common insured, has already been fully indemnified. Acceptance preserved this argument by raising it in its motions for summary judgment, directed verdict, and judgment as a matter of law. The availability of a claim for subrogation under *Mid-Continent* is a question of law subject to de novo review. *See Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991) (holding that "a court of appeals should review *de novo* a district court's determination of state law").

No. 10-50283

*Mid-Continent* involved a dispute between two primary liability insurers, Mid-Continent Insurance Co. ("Mid-Continent") and Liberty Mutual Insurance Co. ("Liberty Mutual"), which provided the same insured with coverage under policies with $1 million limits and standard provisions. *Id.*, 236 S.W.3d at 769. Liberty Mutual also provided additional coverage under a $10 million excess policy. *Id.* The two insurers admitted coverage and cooperatively assumed defense of a lawsuit against their common insured. *Id.* at 769–70. Liberty Mutual reached a settlement in the amount of $1.5 million and demanded that Mid-Continent contribute its proportionate part, but Mid-Continent valued the case at no more than $300,000 and refused to contribute any more than $150,000. *Id.* at 770. The settlement was eventually funded $1.35 million by Liberty Mutual and $150,000 by Mid-Continent. *Id.* Liberty Mutual then sued Mid-Continent under theories of direct contribution and contractual and/or equitable subrogation, seeking to recover Mid-Continent's pro rata portion of the settlement payment. *Id.*

The Texas Supreme Court held that Liberty Mutual could not recover under theories of contractual or equitable subrogation against Mid-Continent.[1] *Id.* at 774. Under either theory, "the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured." *Id.* The insured had been fully indemnified against his loss, and therefore had no contractual right to recover an additional pro rata portion of the settlement from Mid-Continent. *Id.* at 775–76. The court held that Liberty Mutual, standing in the shoes of the

---

[1] The court also held that Liberty Mutual did not have a claim for contribution against Mid-Continent, *id.* at 772–73, but that portion of its ruling is irrelevant here because Maryland's claim for contribution was dismissed by the district court and is not before us on cross-appeal.

No. 10-50283

insured, likewise had no contractual rights against Mid-Continent that it could assert in subrogation. *Id*. at 776.

We recently rejected an overly broad view of *Mid-Continent*'s subrogation exclusion, holding that *Mid-Continent* does not bar contractual subrogation simply because the insured has been fully indemnified. *See Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 305–07 (5th Cir. 2010). We further held in *Amerisure* that *Mid-Continent* does not bar contractual subrogation where, as here, an insurer has denied coverage. *Id.* at 307–08. *Mid-Continent* therefore does not bar Maryland's recovery, on a claim of subrogation, of Acceptance's pro rata share of the settlement. Acceptance absolutely refused to defend and indemnify Guidry; Maryland's insurance policy created a right of contractual subrogation; and its settlement of the McGee lawsuit preserved its right to seek reimbursement from Acceptance for those indemnification costs.

Turning to Maryland's recovery of Acceptance's share of the defense costs, Acceptance's sole argument is that *Mid-Continent* bars Maryland from recovery. But as we recently made clear in *Trinity Universal Ins. Co. v. Emp'rs Mut. Cas. Co.,* 592 F.3d 687 (5th Cir. 2010)), *Mid-Continent* does not address the recovery of defense costs from a co-insurer who violates its duty to defend a common insured.[2] *Id.* at 694. We therefore affirm the district court's judgment as to Maryland's subrogation claim.[3]

---

[2] Acceptance never presented, and we therefore do not address, the question raised by Maryland in its response brief whether our holding in *Trinity Universal* (allowing an insurer to recover a co-insurer's share of defense costs under a claim for contribution) extends to awarding defense costs on a claim for subrogation, as the district court did here. We express no opinion on this question.

[3] The district court also based its decision on Maryland's argument that *Mid-Continent* does not apply to cases involving consecutive, rather than concurrent, liability policies. Because we affirm on the alternate ground that Acceptance denied coverage, we need not reach the consecutive coverage argument here.

No. 10-50283

### III.   Jury Instructions

Acceptance argues that the district court erred in defining "occurrence" in its instructions to the jury, and that the district court's incomplete definition misled and confused the jury as to the law.  Acceptance timely objected to the jury charge, and we therefore review the instructions for an abuse of discretion. *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 352 (5th Cir. 2010).  "We review a defendant's objection to the jury instruction by assessing whether the district court's charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Conner*, 537 F.3d 480, 486 (5th Cir. 2008).

> The court instructed the jury as follows:
>
> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  A deliberate act, performed negligently, is an accident if the effect is not the intended or expected result.

The first sentence is quoted from Acceptance's policy language, while the second sentence—proffered by Maryland—is language taken from the Texas Supreme Court's opinion in *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1 (Tex. 2007).

Acceptance argues that the district court should have included the following third sentence: "An occurrence is not an accident if circumstances confirm that the resulting damage was the natural and expected result of the insured's actions, that is, was highly probable whether the insured was negligent or not."  This language is also taken from *Lamar*, and directly follows the language that was proffered by Maryland and accepted by the district court. *See id.* at 8.  Acceptance contends that the district court's refusal to include this third sentence resulted in an unbalanced instruction, giving the jury a

9

No. 10-50283

misleading or inadequate understanding of what constitutes an "occurrence" and tilting the playing field in Maryland's favor.

It seems to us that Acceptance's proffered instruction on what is <u>not</u> an occurrence is fairly close to the converse of the instruction that was already given to the jury. *See Davis v. Ector Cnty.*, 40 F.3d 777, 786 (5th Cir. 1994) ("The district court has wide latitude in instructing the jury on the law and we will thus ignore technical imperfections." (citation and internal quotation marks omitted)). This point is bolstered by the fact that Acceptance has not shown how it would have argued the case any differently had the court given its requested instruction. *See id.* (stating that we will reverse if we conclude that, based upon the record, an erroneous instruction affected the outcome of the case). Furthermore, including both definitions may have risked confusing the jury. *See id.* ("The function of the reviewing court with respect to instructions is to satisfy itself that the instructions show no tendency to confuse or mislead the jury with respect to the applicable principles of law." (citation and internal quotation marks omitted)). We therefore hold that the district court did not abuse its discretion in excluding Acceptance's proffered instruction.[4]

## IV.   Insufficiency of the Evidence

Finally, Acceptance argues that the district court erred in denying its motion for judgment as a matter of law because Maryland's evidence was legally

---

[4] Acceptance also points to our own use of its proffered language in discussing whether the negligent construction of a different swimming pool was an "occurrence" in *Century Surety Co. v. Hardscape Construction Specialties, Inc.*, 578 F.3d 262 (5th Cir. 2009). However, we used that language in *Century Surety* only to show that the Texas Supreme Court has held that "allegations of unintended construction defects may constitute an 'accident' or 'occurrence' under commercial general liability (CGL) policies." *Id.* at 265–66 (quoting *Lamar*, 242 S.W.3d at 9). In fact, we held in *Century Surety* that the policy definition of "occurrence" in *Century Surety*—which was identical to Acceptance's policy definition—covered the defective construction of the swimming pool that was alleged to be a product of the contractor's negligence in that case. *Id.* at 266.

insufficient to support the jury's verdict as to Questions Two and Four.[5]
Acceptance raised this argument for the first time in its post-verdict motion
under Rule 50(b); it did not move for judgment as a matter of law under Rule
50(a) before the case was submitted to the jury.  As we have previously stated:

> If a party fails to move for judgment as a matter of law under [Rule]
> 50(a) on an issue at the conclusion of all of the evidence, that party
> waives both its right to file a renewed post-verdict Rule 50(b) motion
> and also its right to challenge the sufficiency of the evidence on that
> issue on appeal.  As such, it is the unwavering rule in this Circuit
> that issues raised for the first time on appeal are reviewed only for
> plain error.  On plain error review, the question for this court is not
> whether there was substantial evidence to support the jury verdict,
> but whether there was any evidence to support the jury verdict.  If
> any evidence exists that supports the verdict, it will be upheld.

*Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 238 (5th Cir. 2001) (emphasis
added) (citations, footnote, and internal quotation marks omitted).  We therefore
review for plain error only, and we will not reverse the district court unless there
is no evidence to support the jury's verdict.

## A.    The "Ongoing Damages" Exclusion (Question Two)

The "ongoing damages" exclusion in Acceptance's policies is actually an
endorsement that modifies the coverage agreement.  It states that Acceptance's
insurance coverage applies to "property damage" only if the property damage is
caused by an "occurrence," and the property damage "first occurs" during the
policy period.  "Property damage" is defined in Acceptance's policies, and was
defined for the jury, as "[p]hysical injury to tangible property, including all
resulting loss of use of that property."

---

[5] Acceptance also argues, as a separate issue on appeal, that the trial court "should
have disregarded the jury's findings and entered judgment in favor of Acceptance because all
of the evidence establishes that the Subsidence Exclusion and Ongoing Damages Exclusion
preclude coverage in this case."  This argument simply repeats Acceptance's challenge to the
sufficiency of the evidence in Questions Two and Four, and we do not address it separately.

No. 10-50283

Question Two asked the jury: "Did any of the property damage that was the basis of the lawsuit brought by Hugh McGee first occur during any of the three Acceptance policy periods?"  The jury answered "Yes."

There is evidence to show that two significant types of property damage first occurred during one of Acceptance's policy periods: the third leak that drained the pool, and the long crack along the negative edge wall.  Hugh McGee and Stephen LeBreton, McGee's property manager, both testified that this third leak occurred in March 2005.  Stewart Verhulst, Maryland's structural engineering expert, testified that both this leak and the negative-edge wall crack, which was discovered after the pool had drained, first occurred in March or April of 2005, well within Acceptance's second policy period.  The factual testimony of Hugh McGee and Stephen LeBreton, and the expert testimony of Stewart Verhulst, is evidence that "[some] of the property damage that was the basis of the lawsuit brought by Hugh McGee first occur[red] during [one] of the three Acceptance policy periods."  Because there is some evidence in the record to support the jury's verdict on this question, there is no plain error.

Acceptance does not appear to contest that these damage events of March 2005—the major leak that drained the pool and the crack along the negative edge wall—occurred during its policy period.  Nevertheless, Acceptance argues that there was no evidence to support the jury's finding that this damage first occurred during its policy period.  Acceptance's theory is that the damage to the pool was entirely caused by Guidry's alleged failure to properly set the support piers in the pier-and-beam structure on solid rock in 2003.  This failure, according to Acceptance, resulted in a continuous movement of earth over the next few years, which ultimately caused the leaks and the negative-edge wall crack that developed in 2005.  Acceptance argues, therefore, that all of the damage that occurred in 2005—including the major leak and the wall crack—should merge with the failure to properly set the piers, and should

12

therefore be deemed to have "first occurred" in 2003, during Maryland's policy period.

This theory required the jury to conclude, as a factual matter, that Guidry failed to properly set the support piers on solid rock, that this failure caused the earth to move under the pool structure, and that all the damage to the pool can be traced to this failure and the resulting movement of earth. However, there is some evidence from which the jury could have concluded otherwise. Maryland's structural engineering expert, Stewart Verhulst, testified that it was <u>structural</u> movement between the pool shell and the pier-and-beam structure, as distinct from earth movement, that led to the large crack. Verhulst also testified that Mike Martinez—one of Guidry's subcontractors, who testified that he had not set the support piers on solid rock—was not qualified to testify on that issue, and that Martinez might have believed that an acceptable limestone formation was not "solid rock."

Even if the jury had agreed with Acceptance's premises, Acceptance's "bootstrapping" theory of when property damage "first occurs" is foreclosed as a matter of law. *See VRV Dev. L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 458 (5th Cir. 2011) (" '[P]roperty damage' does not necessarily 'occur' at the first link in the causal chain of events giving rise to that property damage. . . . As the Texas Supreme Court has instructed, we must focus on the time of the 'actual physical damage' to the property, and not the time of the 'negligent conduct' or the 'process . . . that later results in' the damage." (second alteration in original) (quoting *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 24, 29–30 (Tex. 2008))); *Wilshire Ins. Co. v. RJT Constr., LLC*, 581 F.3d 222, 225 (5th Cir. 2009).

In *Wilshire*, the insured repaired the foundation of a home after the home was damaged by an accidental discharge of plumbing water. 581 F.3d at 224. When cracks appeared in the walls and ceiling of the home, its owner attributed

the damage to the foundation being out of level and sued the insured. *Id.* We held:

> The cracks themselves are physical damage allegedly caused by the faulty foundation. This is not a case where latent internal rot long lies undiscovered before external signs warn of the festering damage. The cracks are not merely a warning of prior undiscovered damage; they are the damage itself. It is of no moment that the faulty foundation work occurred in 1999 [before the policy period], or that the damage was discovered in 2005; it matters only that damage was alleged to have occurred in 2005.

*Id.* at 225 (footnotes omitted); *see also VRV Development*, 630 F.3d at 458 (stating that in *Wilshire*, "we refused to conflate an allegedly defective foundation with the separate property damage that ultimately resulted").

Here, the actual physical damage to the property—the leaks and crack—occurred in March 2005, well within Acceptance's second policy period. It is therefore of no moment that any alleged negligence that purportedly later resulted in this damage occurred during Maryland's policy period. As we stated in *VRV Development*, the Texas Supreme Court instructs us to "focus on the time of the actual physical damage to the property, and not the time of the negligent conduct or the process . . . that later results in the damage." *Id.*, 630 F.3d at 458 (alteration in original) (citation and internal quotation marks omitted).

We therefore affirm the district court's judgment against Acceptance's challenge on this ground.

### B.   The "Subsidence of Earth" Exclusion (Question 4)

The "subsidence of earth" exclusion in Acceptance's policies reads:

> It is agreed this policy shall not apply to any claim of liability for . . . "property damage" caused by, resulting from, attributable or contributed to, or aggravated by the subsidence of land as a result of landslide, mudflow, earth sinking or shifting, resulting from your operations or your subcontractor's operations.

> It is further agreed we shall have no obligation to defend or indemnify any insured for such loss, claim or suit.

No. 10-50283

Question Four asked the jury: "Was any of the property damage caused by, resulting from, attributable or contributed to, or aggravated by the subsidence of land as a result of landslide, mudflow, earth sinking or shifting, resulting from Russell Guidry d/b/a Olympic Pools' operations or his subcontractor's operations?"  The jury answered "No."

There is some evidence in the record to support the jury's verdict as to Question Four.  Stewart Verhulst, Maryland's structural engineering expert, testified that it was structural movement between the pool shell and the pier-and-beam structure that led to the large crack, and that structural movement was different and distinct from soil movement.  He also testified that the measurements he took of the coping elevations gave no indication that the pier-and-beam structure had moved.  Verhulst further testified that he had not reviewed any evidence to indicate that any landslide, mud flow, earth sinking or shifting, or erosion was the result of Guidry or his subcontractors' operations.

Maryland's claims adjuster, Kathy Murray, testified that, had she believed that earth movement led to the leaks and the crack in the pool, she would not have settled the claim because Maryland also had an earth movement exclusion that would have allowed it to deny coverage.  Maryland's "earth movement" exclusion stated, in relevant part, that Maryland would not pay for loss or damage caused directly or indirectly by "[a]ny earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting."

The expert testimony of Stewart Verhulst and the factual testimony of Kathy Murray is evidence from which the jury could have concluded that none of the property damage at issue in this case was "caused by, resulting from, attributable or contributed to, or aggravated by the subsidence of land as a result of landslide, mudflow, earth sinking or shifting, resulting from Russell Guidry d/b/a Olympic Pools' operations or his subcontractor's operations."  We

15

No. 10-50283

therefore conclude that there was no plain error, and we affirm the district court's judgment against this challenge.[6]

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court entered on the verdict in this case.

---

[6] Because we affirm on this ground, we do not reach Maryland's alternative argument that Acceptance's subsidence exclusion does not apply as a matter of law.

16