# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 17, 2012

No. 10-31271

Lyle W. Cayce
Clerk

MONIQUE ROMAN, Administratrix of the Succession of Doral Roman

Plaintiff-Appellee Cross-Appellant

v.

WESTERN MANUFACTURING, INCORPORATED,

Defendant-Appellant Cross-Appellee

Appeals from the United States District Court
for the Western District of Louisiana

Before JONES, Chief Judge, PRADO, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

A jury found Western Manufacturing, Inc. liable to Dorel Roman under the Louisiana Products Liability Act for injuries caused by a defect that render one of its stucco pumps unreasonably dangerous. Western argues the expert testimony underlying Roman's case was inadmissible under the Federal Rules of Evidence and insufficient under Louisiana law to sustain liability; it also argues the district court's increase of the jury's damage award violated the Seventh Amendment. Roman cross-appeals. We AFFIRM.

## FACTUAL AND PROCEDURAL HISTORY

Western is a California corporation that produces the mobile Predator Pump for the commercial application of stucco. While working with one of these

No. 10-31271

pumps on July 10, 2007, Dorel Roman sustained multiple bone fractures and extensive soft-tissue injuries when a high-pressure hose dislodged and struck his legs. The previous day, Roman had taken delivery of the pump and an accompanying high-pressure hose directly from Western's manufacturing plant. The pump had been running less than 15 minutes on its first operation when the accident occurred.

Roman owned a stucco business. He received the stucco subcontract for a construction project. Roman had substantial experience using stucco pumps in his home country of Romania, in Germany, and in the United States where he had lived since 2001. On July 10, he transported the pump to the job site. He was accompanied by Michael Funk, an employee familiar with the Western brand of pumps. Funk was the nozzle operator performing the physical stucco application. The general contractor, Richard Delahoussaye,[1] was present during the pump set-up and visually inspected it prior to use. Roman testified that he read the instruction manual at least twice and that Funk also read it to ensure correct set-up and operation.

The Predator Pump consists of a diesel engine, a mixer for the stucco, a batch hopper, and the pumping mechanism, all mounted on a two-wheel trailer that can be hitched to a passenger truck. Its design is a positive displacement pump that pulls the slurry from the hopper into a thick 250 foot-long rubber hose for application. The pump must be primed and lubricated with water. The slurry is made with cement and water in the mixer, and then added to the hopper. A Cam-Lok fitting (a metal coupling) attaches to the pump's manifold and secures the hose in place. The fitting becomes fully engaged and locked when both "arms or ears are pulled down"; those arms have two locking pins. Roman, Funk, and Delahoussaye all testified that they observed that the Cam-

---

[1] He was also the uncle of Roman's wife.

2

No. 10-31271

Lok was fully engaged and secured.  At trial, Western argued that the jury should disbelieve this.

The pump's key safety feature is a pressure relief valve ("PRV").  The valve consists of a brass port assembly that contains a red polyurethane ball.  All the stucco travels across the valve, which is located next to the manifold with the hose.  According to the operating manual in evidence:

> The PRV is designed to protect the hose assembly from extreme pressures. . . . The ball will stay in place until enough pressure occurs that will cause the ball to blow out through the opening in the brass cap and release the pressure.

Roman testified to standing 18 to 20 feet from the right side of the machine, which is the side with the hose.  Funk began operating the pump and spraying stucco through the nozzle.  Roman testified he checked the stucco and was walking away from the pump when he heard a pop and fell to the ground.  According to Funk, the slurry seemed to be flowing properly through the machine when he also heard that pop.  Roman's theory at trial was that the Cam-Lok ruptured under excessive pressure, causing the hose, which was attached to a piece of the metal Cam-Lok, to strike him.

The parties consented to have a magistrate judge preside over the jury trial.[2]  The parties filed competing evidentiary motions *in limine*.  Roman sought to exclude Western's mechanical engineer Robert Gregory. Western sought exclusion of Roman's liability and causation experts, Dr. Kurt Vandervort and Dr. Kenneth R. Riggs, and exclusion of an economist and a vocational specialist who gave opinions about future lost income.  After an evidentiary hearing, the court denied the motions against the economist, the vocational specialist, and Dr. Vandervort, while reserving objections to Riggs for trial.  During trial, Western reurged its motions as to Riggs and Vandervort.  They were denied.

---

[2] All references to the court or district court concern actions by the magistrate.

No. 10-31271

Trial commenced on September 20, and the jury returned its verdict ten days later. The jury found liability on one of two potential theories under the Louisiana Products Liability Act. It concluded that Western's pump was defective in "construction or composition" but assigned no liability based upon a dangerous design. Responding to interrogatories, the jury found that although Roman had used the pump "in a reasonably anticipated manner," he had also been negligent, such that 70 percent of the fault rested with him. It assigned Western the remaining 30 percent of fault by virtue of its pump's defect. It awarded a total of $1,665,000 in damages, which netted Roman $499,500 when adjusted to reflect comparative fault. Damages were itemized by the jury across nine categories, including pain and suffering, past and future medical expenses, physical disability, and loss of life enjoyment.

Western's renewed motion under Federal Rule of Civil Procedure 50 for judgment as a matter of law as to the construction/composition theory was denied. Roman's first Rule 50 motion came after the verdict. Over objection, the court granted a motion by Roman to amend the judgment, increasing the jury's award of "past medical expenses" from $15,000 to $168,804.22.

Roman and Western both timely appeal. Western argues liability fails on the construction claim, while Roman argues that liability should also be imposed under the design defect theory. Each side also appeals the admission of the opposing party's experts and challenges the jury's apportionment of comparative fault. Finally, Western contends that the increase of damages violated the Seventh Amendment.

On January 7, 2011, soon after filing a notice of appeal, Roman died at age 33. Monique Roman, as administratrix of his estate, has been substituted as a party.[3] *See* Fed. R. App. P. 43(a). Our jurisdiction is based on the diversity of

---

[3] Throughout, references to Roman refer either to the decedent or to the administratrix as the party on appeal depending on the context.

4

No. 10-31271

the parties; Roman is a Louisiana citizen and Western has its principal place of business in California and is incorporated there.  28 U.S.C. § 1332(c)(1).


## DISCUSSION

When properly preserved, this court reviews a district court's decision on a motion for judgment as a matter of law *de novo*.  *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039 (5th Cir. 2011).  "We are wary of upsetting jury verdicts and will uphold a jury verdict unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable jurors could not arrive at any verdict to the contrary."  *Id.* (quotation marks and citations omitted).  Thus, only when "there is no legally sufficient evidentiary basis" will we disturb the jury's verdict.  *Id.* at 1039-40.  It is not our charge to decide which side has the more persuasive case.  *Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997).  For, "it is the function of the jury as the traditional finder of the facts, and not for the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."  *Id.*

The central disputes in this appeal are whether the theories offered by Roman's experts met the standards for scientific reliability under the Federal Rules of Evidence and whether the jury's imposition of liability for a defect in "construction or composition" of the pump can stand.  La. Rev. Stat. § 9:2800.55.  We conclude there was no error as to those disputes.  After that analysis, we consider the comparative fault challenges, Roman's Rule 50 motion on a design defect under Section 9:2800.56, and finally, explain why the increase in the medical award was appropriate.

## I.    *Daubert Challenges*

While the substantive law of Louisiana governs liability, the Federal Rules of Evidence control the admissibility of the expert testimony.  *See Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002).

No. 10-31271

Before certifying an expert and admitting his testimony, a district court must ensure that the requirements of Federal Rule of Evidence 702 have been met. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). Often, as here, this determination follows a pretrial *Daubert* hearing where the testimony is explained and challenged in the adversarial process, without the risk of prejudicing the jury. Wide latitude is granted to what the trial court decides. That discretion "will not be disturbed on appeal unless it is manifestly erroneous." *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010). This deferential abuse-of-discretion standard applies to both the expert's qualifications and to the reliability determination. *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010).

A qualified witness may offer specialized or technical opinion evidence when based (1) on "sufficient facts or data"; (2) "the product of reliable principles and methods"; and (3) when "the expert has reliably applied [those] principles and methods to the facts of the case." Fed. R. Evid. 702. The reliability inquiry under *Daubert* is a flexible one, permitting the district court to identify the most germane considerations. *Valencia*, 600 F.3d at 424.

A.    Expert Credentials

Both Vandervort and Riggs, whom Western challenged, worked for Stress Engineering. Each held a Ph.D. in his respective field, mechanical engineering and material science. Only five percent of Vandervort's work was litigation based. Neither had specific experience in the stucco industry. Vandervort had worked extensively with positive displacement pumps designed like the Predator, and Riggs's trade as a failure analyst involved examining malfunctioning machinery in search of the cause.

We conclude both men were well-qualified as experts "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The conception of

6

No. 10-31271

expertise urged by Western, by which Vandervort and Riggs could not testify about a stucco pump because stucco is not their trade, could make expert certification decisions a battle of labels – label the needed expertise narrowly and the offered expert's field broadly.  *See Huss v. Gayden*, 571 F.3d 442, 455-56 (5th Cir. 2009).  The district court was within its wide discretion to conclude that these offered witnesses had the qualifications to state a reliable opinion on the subjects for which they were certified.

B.     Admissibility of Liability Evidence

More substantial, though also unavailing, is Western's contention that the theory offered by Vandervort to explain the failure of the pump was (1) unreliable and (2) not based on a sufficient factual predicate.

At the *Daubert* hearing, the facts and reliability of Vandervort's liability and causation testimony were thoroughly explored by the parties and the court. Assessing this testimony and the accompanying documentation ourselves, we conclude that the district court's decision to admit the evidence – coupled with vigorous cross-examination – was not manifestly erroneous.

*1. Reliability of the Failure Analyses*

"In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*." *Daubert*, 509 U.S. at 590 n.9.  Relevant questions may include whether a technique or theory is generally accepted in the technical or scientific community, if it "can be or has been tested," and the potential influence of the rate of error.  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). The *sine qua non*, however, is whether in his courtroom presentation the expert used "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Valencia*, 600 F.3d at 424 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Western claims that scientific principles did not underlie Vandervort's methods.  This is incorrect.  Vandervort connected a pressure release valve to a

No. 10-31271

device that stores and releases energy: an accumulator. The accumulator stood in for the pump, but allowed for experimentation. Different levels of pressure could be replicated over different time intervals.

First came quasi-static testing, which measured baseline characteristics of the Predator Pump. Under a "relatively slow pressurization event" the valve functioned normally, expelling the ball at approximately 900 psi. During the quasi-static test, the Cam-Lok ruptured at 2,007 psi. Next came the dynamic test. It was exactly the same, except that rather than apply it slowly, pressure was introduced in two-thousandths of a second. Vandervort hypothesized before the test that "under a rapid pressure event that ball might be bypassed and the fitting would fail before the ball released." To control how much pressure was introduced, Vandervort used a disc that is manufactured by a specialized vendor to rupture at a given pressure, here 2,500 psi. During the dynamic test the ball began to extrude from its brass cap, but did not escape, leading the Cam-Lok to break as predicted, as its pins gave way.

The company makes much of the fact that Vandervort stated that no textbook lays out these testing protocols. Vandervort explained that the processes cannot be found in a text or manual, because

> what we did is we took engineering principles, we took experience, and we put together a plan to learn about these components. Now, did we violate the principles and the understanding and the basics of physics in that process? Not at all. We applied our engineering knowledge to create a testing scenario.

The district court made a specific finding that the principles behind both the dynamic and quasi-static failure analyses were generally "accepted in the engineering community." *See Daubert*, 509 U.S. at 594. The absence of textual support or published studies is not dispositive when reliable methods are used. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007).

8

No. 10-31271

Furthermore, the "district court has wide discretion to admit evidence of experiments conducted under substantially similar conditions." *United States v. Norris*, 217 F.3d 262, 270 (5th Cir. 2000) (quoting *Barnes v. Gen. Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977)).  Here, the experiments reconstructed the exact design of the Predator Pump.  In fact, it is uncontroverted that the pressure release valve, ball, and Cam-Lok were identical to the ones in the pump used by Roman.  Each item was supplied directly from Western or its suppliers and the functioning of the system was not modified.

### 2. Pump's Capacity to Generate Pressure

In addition to being based on reliable methods, expert evidence must "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  "To be 'helpful' under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry."  *United States v. Posado*, 57 F.3d 428, 433 (5th Cir. 1995).  Principally this is a matter of relevance. "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (quotation marks and citation omitted).

Western argues that the expert testimony is inadmissible on this basis because the theory promoted by Vandervort and Riggs rested on the unfounded assumption that the pump could generate the 2,007 psi of pressure that caused the Cam-Lok to fail during testing.[4]  This precise issue troubled the district court and was the key reason it convened a *Daubert* hearing.  After Vandervort fully explained his method and calculations, the court held that while Western's "cross-examination was quite effective," ultimately such doubts affected "the weight of the evidence, as opposed to the admissibility of his testimony."

---

[4] Mathematical calculations by Vandervort based on his estimate of the shearing strength of the pins predicted failure at 2,036 psi.

No. 10-31271

"The proponent of an expert's testimony need not prove the testimony is factually correct . . . ." *Paz*, 555 F.3d at 388. Thus, as to admissibility, the issue is not whether the pump generated the necessary pressure, but instead whether there were enough facts to allow Vandervort's dynamic pressure theory to be applied reliably to this case. We agree with the district court that there were. This evidence came in three forms, as we discuss.

First, a high-pressure event could be inferred from physical features of the Cam-Lok and PRV ball in the actual pump that injured Roman. Riggs, the expert metallurgist, testified at trial that a visual inspection of the pump revealed that "[b]oth pins had been sheared, and . . . [t]he back ends of these pins were still resident in the Cam-Lok connector, [while] the other ends were gone." The pump's physical design is such that when the pins shear, the Cam-Lok arms fall away, and the ends of the hose separate. Photographs of the accident scene corroborated that the pins were broken and that the hose coupling had, in fact, disengaged. One of the two sheared pins was recovered, and Western's expert witness Gregory admitted at the *Daubert* hearing that both pins sheared.

Both Riggs and Vandervort gave expert opinions that the only foreseeable event that would cause both pins to shear as they did was exposure to high pressure. Western posited that Roman had neglected to engage the Cam-Lok fully, or that user manipulation caused the failure of the fitting.[5] Yet, when challenged on whether it was possible for the pins to shear if the cam arms were not securely closed, Riggs replied:

> Absolutely not. The pins – the arms have to be connected. They
> have to be in contact with this male member to be loaded up by the

---

[5] The district court held Gregory's opinions that the Cam-Lok had either been forced open or that it was not properly locked inadmissible. At the *Daubert* hearing, the court characterized them as "speculative theories" and in ruling at trial explained: "I haven't heard any facts in evidence beyond Mr. Roman saying he actually connected the hose and dogged down the ears. So saying that someone kicked the hose or things to that nature, I'm not going to let [Gregory] testify because it's just not there."

No. 10-31271

pressure-induced forces on that male member for the pins to shear. If the arm is all the way up, it does not become engaged during the exit of this male member, and so if it's not engaged, it won't shear the pin. If one of these arms on this connector right here had been loose, it would still be in that connector. The pin would not have sheared and it would still be in the connector.

Riggs offered a similar opinion about how the ball had behaved. The jury was shown a photograph of the ball after the accident. In discussing that photograph, Riggs testified that the observable "reduction in the original diameter" of the ball was

clear evidence that during the incident the pressure got high enough to begin the extrusion process of this ball, and it's clear that the ball came through the . . . hole in the brass cap, not by . . . a shearing process, not by a physical tearing of the material, but it actually – it actually deformed and actually started to extrude the hole and that's the mechanism by which [it] works.

Second, the experts testified that the physical condition of the Cam-Lok sheared in the dynamic test and the partially extruded ball were nearly identical in appearance to the parts recovered from the pump involved in the accident. Not only did the pins shear, and the hose separate in like fashion, but the ball behaved similarly.

Third and finally, evidence that the pump could rapidly generate high pressure came from Vandervort's calculations. Entering the *Daubert* hearing, both parties' experts were in agreement that the pump's diesel engine only had enough horsepower to generate 1,600 psi under ordinary operating conditions. Because this is less than the roughly 2,000 psi necessary under Roman's theory of liability, Western argues that the expert testimony lacked the factual basis for its admissibility.

We conclude this argument fails for two reasons. (1) The valid test results, combined with the ball's movement and the shearing of the Cam-Lok pins sufficiently demonstrated that a rapid high-pressure event could have occurred.

(2) As we explain next, Vandervort also provided scientific calculations illustrating how the pump could spike to over 2,000 psi in an instant.

The positive displacement pump continuously generates energy while operating. A "pack-up" that interrupts the flow would cause a compression of the stucco material's "molecules in a smaller and smaller space." This process builds energy, measured as inertia, which rapidly spikes in a high-pressure event. The district court found Vandervort's conclusions were based "on the principles of physics and mathematics." Vandervort also submitted the calculations yielding these results.[6] After studying those calculations, Western's expert admitted that Vandervort had computed them accurately according to a sound methodology.

While it is true that Roman did not introduce direct evidence of a pack-up, trial evidence indicated a pack-up was neither a speculative nor a rare phenomenon. The operating manual warned that aggregate can separate from the stucco mixture, which "will not carry through the hose and 'pack' (jam up) in the hose." In bold typeface it further cautions that "[a]ttempting to push past a hose pack is rarely successful and is very dangerous! . . . The Predator pump can build dangerously high pressure very quickly as it is a positive displacement pump."[7] Delahoussaye testified that he had witnessed pack-ups in his experience when the hose kinks or the stucco mix is too dry. Western noted below, and now on appeal, that Delahoussaye testified he believed that the stucco mix was very wet on the day of the accident. From this, the company

---

[6] In brief, based on the 120 strokes per minute generated by the pump and the 16 inches of stucco material between the pump mechanism and the coupling, over 3,000 psi could be generated in two-thousandths of a second.

[7] The other criticisms raised on appeal by Western such as an improper bulk modulus of stucco (its compressibility), the location of the suspected pack-up, or the strength of the pump's drive shaft were all contested facts about which the parties' expert testimony could support rival conclusions. We may not second-guess the jury's choice between duly qualified experts. *See Coffel v. Stryker Corp.*, 284 F.3d 625, 631 (5th Cir. 2002).

urges us to exclude Vandervort's testimony.  We agree with the district court's assessment when it refused to exclude Vandervort's testimony:

> The evidence that's in the case is that [the hose] could have kinked. The evidence in the case is that there could be a pack-off.  Mr. Delahoussaye could be wrong.  You can draw inferences from the testimony of the witnesses, but the evidence is that there was a pressurization which occurred.

> There was certainly contrary evidence, but that was for jurors to weigh.

Roman's liability and causation evidence was admissible under Rule 702.

C.     Other *Daubert* Challenges

Several other expert evidence challenges have been raised.

In his cross-appeal, Roman claims that the testimony of Western's liability expert, Gregory, was inadmissible.  Gregory was a registered professional engineer hired to evaluate and critique Vandervort's opinions.  Roman has not raised any credible challenge to Gregory's testimony, claiming only that his "opinions defy common sense and logic."

Western would exclude Roman's other experts, Stephanie Chalfin, M.S. and Dr. R. Douglas Womack.  Chalfin was a vocational rehabilitation counselor and Womack an economist who estimated the loss of income Roman would likely incur from his leg injuries.  Western objects to both individuals on Rule 702 grounds, and claims the economic evidence was irrelevant and confused the jury. *See* Fed. R. Evid. 401, 403.

The district court found in denying the motion *in limine* to exclude these two experts that Louisiana law permits injured plaintiffs to recover "an award for loss of earnings and earning capacity" and pre-accident income is not dispositive about its amount. *Hobgood v. Aucoin*, 574 So. 2d 344, 346 (La. 1990). Roman's business involved manual labor and required him to stand as many as 12 hours daily; he could no longer fulfil those responsibilities.  It was not

speculative for Chalfin to conclude that he would need to hire a supervisor in order for his business to continue.

Western also argues that Womack's testimony that Roman would lose income was unreliable and factually unsupported because an unfiled tax return from the year after the accident showed business earnings greater than those from the preceding ones. This is not an evidentiary objection, but rather a request for reconsideration of a factual matter resolved by the jury. We note Roman sought over $1,000,000 in lost wages and received only $600,000, suggesting the jury may have partly credited Western's argument.

## II.    *Sufficiency of the Evidence – La. Rev. Stat. § 9:2800.55*

Because none of the expert evidence was improperly admitted, we turn now to Western's sufficiency challenge.

This case was tried exclusively under the Louisiana Products Liability Act ("LPLA"). The Act has a single cause of action holding manufacturers liable for damages "proximately caused by a characteristic of the product that renders [it] unreasonably dangerous when such damage arose from a reasonably anticipated use of the product." La. Rev. Stat. § 9:2800.54. A product can be "unreasonably dangerous" in four different ways. *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 261 (5th Cir. 2002). Only two of these were put to the jury. They were the "design defect" theory under Section 9:2800.56, and the "construction or composition" theory under Section 9:2800.55. The jury found liability on the latter basis, on which it had been instructed from the statute's text, as follows.

> A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.

La. Rev. Stat. § 9:2800.55.

No. 10-31271

Because "LPLA liability for a defect in construction or composition is strict liability," the plaintiff need not show that "the manufacturer knew or should have known of the product deviation and could have prevented it," *i.e.*, negligence. John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. L. Rev. 565, 594 (1989);[8] *id.* at 595 & n.140, 141; *see also Joseph v. Bohn Ford, Inc.*, 483 So. 2d 934, 940 (La. 1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 340 & n.3 (5th Cir. 2008).

Western argues that there was no legally sufficient evidentiary basis on which the jury could reach its verdict. Because this argument was properly preserved, we consider it *de novo*. *Goodner*, 650 F.3d at 1039. Most of Western's arguments for judgment as a matter of law are interwoven with its arguments against the admission of Roman's experts. A few independent assertions can be discerned, and we address them as well.

The company first argues that Roman improperly used the evidentiary doctrine of *res ipsa loquitor*, or "the thing speaks for itself." The "doctrine means that the circumstances surrounding an accident are so unusual as to give rise to an inference of negligence or liability on the part of the defendant." *Jurls v. Ford Motor Co.*, 752 So. 2d 260, 265 (La. Ct. App. 2000). The plaintiff has repeatedly disavowed reliance on *res ipsa loquitor*. In contesting Western's Rule 50(b) motion, counsel for Roman told the district court: "we're not alleging *res ipsa*, we're saying what an analogy that is. . . . [The pump] is out of the box and 10 or 15 minutes later the hose explodes. So we're not alleging that." Given this, it is unnecessary for us to rule whether the doctrine could have been used in this case. We do note, however, that contrary to Western's claims of impropriety, the Louisiana Supreme Court has expressly held "that the doctrine

---

[8] Courts consider Kennedy a reliable authority, in part, because he co-drafted the LPLA. *Hunter ex rel. Hunter v. Knoll Rig & Equip., Mfg. Co.*, 70 F.3d 803, 805 n.2 (5th Cir. 1995).

of *res ipsa loquitur* is applicable to products liability actions" under the LPLA. *Lawson v. Mitsubishi Motor Sales of Am., Inc.*, 938 So. 2d 35, 49 (La. 2006); *see also id.* at 46-51; Frank L. Maraist & Thomas C. Galligan, Jr., *Louisiana Tort Law* § 15.09 (2004 ed.), at 15-17 to 15-18.

Western further contends the concept that "circumstantial evidence can be used to infer that a product is unreasonabl[y] dangerous . . . is not the law, and this Court should not give any value" to it. We disagree. The defect under Section 9:2800.55 "may be established by circumstantial evidence." *Bohn Ford*, 483 So.2d at 940; *see also* Kennedy, *supra*, at 595 & n.140, 141; *Hanover Am. Ins. Co. v. Trippe Mfg. Co.*, 843 So. 2d 571, 576 (La. Ct. App. 2003). Leading scholars on the LPLA explain that plaintiffs "generally rel[y] heavily on circumstantial evidence." Maraist & Galligan, *supra*, at 15-17.

The final aspect of Western's challenge is that Roman's evidence fell short of what was necessary to prove by a preponderance that the pump deviated from Western's "specifications or performance standards, or from components in identical" Predator Pumps. *Lawrence v. Gen. Motors Corp.*, 73 F.3d 587, 589 (5th Cir. 1996). To prevail under the construction or composition theory, Louisiana courts require the plaintiff to (i) set forth the manufacturer's specifications for the product and (ii) demonstrate "how the product materially deviated from those standards so as to render it 'unreasonably dangerous.'" *Jenkins v. Int'l Paper Co.*, 945 So. 2d 144, 150 (La. Ct. App. 2006); *see also Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 764 (W.D. La. 2000). "Any deviation that increases the propensity for injury is material." *Masters v. Courtesy Ford Co.*, 758 So. 2d 171, 192 (La. Ct. App. 1999), *vacated on other grounds by* 765 So. 2d 1056 (La. 2000).

The specifications Roman relied upon are clear from the record. The performance standard was based both on the Predator Pump's operating manual and testimony from Western about its internal performance standards.

No. 10-31271

Western's general manager Darren Dyck testified that the polyurethane ball is designed to eject when the pressure reaches between 750 and 1,000 psi. Similarly, the operator's manual represented that the "ball will stay in place until enough pressure occurs that will cause the ball to blow out through the opening in the brass cap and release the pressure." *See Hanover Am.*, 843 So. 2d at 577 (holding that a triable issue on construction/composition theory existed because performance standard for an electrical component deemed "not [to] include igniting a fire in normal operation").

As to how the deviation occurred, the jury was entitled to credit testimony by Vandervort and Riggs that the Cam-Lok shearing evidenced that pressures above 2,000 psi were reached. Crucially, as recounted already, uncontroverted evidence is that the ball on his machine, in fact, never ejected.

The defect cannot be based "solely on the fact that an accident occurred." *Morris v. United Servs. Auto. Assoc.*, 756 So. 2d 549, 558 (La. Ct. App. 2000). According to this principle, liability has been withheld when an expert could not "offer an explanation or theory as to which component" of the product failed, or how the failure could have caused the accident. *Id.* It is also inadequate if, after the expert was excluded, the remaining evidence provided no explanation for why the product failed. *Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 312 (5th Cir. 1990). However, neither defect existed here. Roman's experts identified the PRV ball as the root cause of the explosion and supported their theories through the quasi-static and dynamic tests, as well as with calculations according to the laws of physics. This was sufficient.

On the other hand, a jury inference that a clog or hose-kink occurred would have to be despite lay testimony that the stucco slurry was flowing easily and the absence of proof of a kink. We do not find the inference to be impermissible. *See Weber v. Fid. & Cas. Ins. Co. of N.Y.*, 250 So. 2d 754, 757

17

No. 10-31271

(1971); Maraist & Galligan, *supra*, at 15-3, 15-12 to 15-17.[9] "A jury may draw reasonable inferences from the evidence, and those inferences may constitute sufficient proof to support a verdict." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995) (quotation marks and citation omitted).

There is no basis to set aside the jury's finding of a defect under Louisiana Revised Statute Section 9:2800.55.

### III.   *Other Rule 50 Issues*

Several other bases for judgment as a matter of law have been argued on appeal. Roman seeks judgment on the alternative theory put to the jurors that the pump was "unreasonably dangerous in design." La. Rev. Stat. § 9:2800.56. Both Roman and Western also want us to set aside the jury's allocation of comparative fault between the pump's defect and Roman's negligence, though the fault they each see differs dramatically.

Joining all three challenges is the failure to raise them in the manner dictated by Rule 50. *De novo* review would advantage both parties, which could explain why neither side has raised this problem. We must determine our standard of review. *United States v. Peltier*, 505 F.3d 389, 391 & n.1 (5th Cir. 2007). A Rule 50(a) motion must be pursued at some point before the return of the jury verdict. *Md. Cas. Co. v. Acceptance Indem. Ins. Co.*, 639 F.3d 701, 707 (5th Cir. 2011); *United States ex rel. Wallace v. Flintco Inc.*, 143 F.3d 955, 963 (5th Cir. 1998). As the district court found, Roman did not move under Rule 50(a) at any of his available opportunities.

The pre-verdict motion must also concern the same points of error as the renewed motion after the verdict under Rule 50(b). *See* 9 *Moore's Federal Practice* § 50.43[3], at 50-71 to 50-74 (3d ed. 2012); *Bay Colony, Ltd. v.*

---

[9] *See* Kennedy, *supra*, at 595 ("*Weber* would be decided the same way under section 2800.55 as would most other pre-LPLA cases involving such defects.").

*Trendmaker, Inc.*, 121 F.3d 998, 1003 (5th Cir. 1997).  This ensures that the opposing party is alert "to the specific grounds for an anticipated challenge to the sufficiency of its proof" and allows that party "the opportunity to move to cure any such deficiency."  *Flintco*, 143 F.3d at 963; *see also* 9 *Moore's Federal Practice* § 50.21[3], at 50-48 to 50-49.  As the district court recognized, although Western did bring a Rule 50(a) motion at the close of the plaintiff's case as to the "unreasonably dangerous characteristics of the Predator Pump," it "made no such [pre-verdict] motion with regard to the plaintiff's comparative fault."

Because these failures undermine the essential purposes of Rule 50, these arguments are considered as though raised for the first time on appeal.  *See Flintco*, 143 F.3d at 963-64; *Purcell v. Seguin State Bank & Trust Co.*, 999 F.2d 950, 956-57 (5th Cir. 1993).  Our review is therefore for plain error, requiring us to uphold the jury's resolutions if we discern "*any* evidence" in support.  *Flintco,* 143 F.3d at 964.  That standard is satisfied both for comparative negligence and the design defect theory of LPLA liability as we now explain.

A.    Comparative Negligence

Comparative fault principles under La. Civ. Code art. 2323 apply to LPLA claims.  *Scott v. Am. Tobacco, Co.*, 830 So. 2d 294, 303 (La. 2002) (Victory, J., concurring and dissenting); *see Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306, 315-16 (5th Cir. 1998) (en banc).  Both parties challenge the validity of the jury's assignment of 30 percent fault to Western and 70 percent to Roman.

Western argues that even if liability were proper, the only legally permissible apportionment of comparative fault is that Roman was 100 percent negligent.  The manual cautions to "[n]ever stand on the side of the machine where the hose leaves the pump while it is in operation."  Sitting *en banc* we have held that "some of the plaintiff's negligent conduct" is appropriately part of the LPLA's definition of the use manufacturers reasonably anticipate. *Kampen*, 157 F.3d at 312.  Drawing inferences in Roman's favor as we must, the

jury could have concluded that this warning did not literally prohibit standing on the hose side of the pump at any and all distances, especially given that Western shipped it with a 250-foot section of hosing. *See* Kennedy, *supra*, at 585-86 (explaining standard as those uses "a manufacturer should reasonably expect of an ordinary consumer."). Roman testified taht at the time of the accident, he was 18 to 20 feet away from the pump and walking away from it at a 45 degree angle. Rather than placing him directly in line with the hose coupling, this places him behind the machine on the hose side.

Roman's contrary charge that "the jury clearly did not have a sufficient evidentiary basis to find him comparatively negligent" is close to being frivolous, particularly given our standard of review.

B.    Design Defect Theory

Roman's argument that no rational jury could have withheld liability on the design fails. Section 9:2800.56 provides in part that:

> A product is unreasonably dangerous in design if, at the time it left its manufacturer's control:
>
> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
>
> (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. . . .

Thus, the statute required Roman to prove (i) that an alternative design existed at the time Western manufactured the Predator Pump, and (ii) "that the risk avoided by using the alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design (added construction costs and loss of product utility)." *Lawrence*, 73 F.3d at 590 (quotation marks and citation omitted).

No. 10-31271

Roman offered two possible alternative designs at trial – safety cables and heavier duty fittings. Roman made no serious effort to evaluate these measures' risk/utility, as required by the LPLA. *See id.*

There was also testimony by Western's general manager that the Cam-Lok coupling conformed to industry standards. Little more was shown about the heavy duty fittings than that they would have increased the "safety factor ratio." The evidence as to safety cables was even weaker. Though Western's manager stated he had seen safety cables used by customers, he was testifying about fireproofing machines, not stucco pumps.

As Western notes as to both, Roman failed to "address the burdens or adverse utility effects of his proposed changes." *Smith v. Louisville Ladder Co.*, 237 F.3d 515, 520 (5th Cir. 2001). In *Lawrence,* we held that such a shortcoming rendered the evidence "insufficient as a matter of law to support a finding of design defect." *Lawrence*, 73 F.3d at 590 (plaintiff's expert testimony that "alternative design would have been obviously inexpensive and easily implemented" held insufficient under LPLA).

## IV.    Re-examination Clause

One final issue remains. In its itemization of damages, the jury returned $15,000 in compensation for "past medical expenses." After trial, Roman sought to have the judgment amended to award $168,804.22 instead. The basis for the request was that without objection Roman had entered into evidence copies of medical records and bills totaling that sum. Without cross-examination from Western, three doctors – an orthopedist, plastic surgeon, and wound therapist – had explained the treatment in those records, and testified that the care had related to the July 10, 2007 accident and was medically necessary.

Given these facts, and that at no time had Western disputed the treatment or its value during trial, the court found that the jury had no valid basis in

21

No. 10-31271

evidence for its $15,000 sum, as opposed to the full measure of medical costs. The court modified the judgment to reflect the $168,804.22 and correctly reduced it according to the jury's comparative fault assignment.

Western argues this modification was impermissible additur that violated the Seventh Amendment's Re-examination Clause:

> [N]o fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII. Trial courts have the power to grant a new trial when the verdict is "against the weight of the evidence." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (quotation marks and citation omitted). Implicit in the court's new-trial power is the prerogative, when damages are too great, to instead secure agreement from the "plaintiff to remit excessive damages." *Dimick v. Schiedt*, 293 U.S. 474, 486-87 (1935). As a general matter, the Supreme Court has held that this "remittur withstands Seventh Amendment attack," while proposing the opposite bargain, known as "additur, [is] unconstitutional." *Gasperini*, 518 U.S. at 433.

Nonetheless, "[t]he constitutional rule against additur is not violated in a case where the jury ha[s] properly determined liability and there is no valid dispute as to the amount of damages. In such a case the court is in effect simply granting summary judgment on the question of damages." *Moreau v. Oppenheim*, 663 F.2d 1300, 1311 (5th Cir. 1981) (quotation marks and citation omitted). This principle is firmly recognized across the circuits.[10]

The district court thus correctly concluded, under these facts, that this exception applies. *Id.*; *see also Liriano v. Hobart Corp.*, 170 F.3d 264, 272-73 (2d

---

[10] *See, e.g.*, *E.E.O.C. v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1252 (11th Cir. 1997) ("Courts recognize an exception to *Dimick* where the jury has found the underlying liability and there is no genuine issue as to the correct amount of damages."); *Decato v. Travelers Ins. Co.*, 379 F.2d 796, 798 (1st Cir. 1967) (similar).

No. 10-31271

Cir. 1999) (holding no Re-examination Clause violation when, in products liability action, district court added cost of a hospital bill submitted to jury to total damage award).   These instances of uncontested damages "do not technically involve additur, because the correct figure is divined as a matter of law, and the plaintiff is not made to choose between the increased damage award and a new trial."  12 *Moore's Federal Practice* § 59.13[2] at 59-80.

We AFFIRM the judgment on the jury verdict as modified by the district court.